CLYDE FULLER, Plaintiff-Appellee, v. TENNESSEE-CAROLINA TRANSPORTATION COMPANY, Defendant-Appellant. —471 S.W.2d 953.

Middle Section. November 27, 1970.

Certiorari Denied by Supreme Court October 18, 1971.

T. T. McCarley, of Edwards, Schulman, McCarley, Hollins & Pride, Nashville, Tenn. for plaintiff-appellee, Clyde Fuller.

Don R. Binkley, of Gracey, Buck, Maddin & Cowan, Nashville, Tenn., for defendant-appellant Tennessee-Carolina Transp. Co.

PURYEAR, J. This is a suit for property damage and we will refer to the parties as plaintiff and defendant as they appeared in the trial Court.

The case was tried before the Circuit Judge and a jury on January 19, 1970, and resulted in a judgment in favor of plaintiff for the sum of $12,000.00 based upon a jury verdict for that amount.

The defendant-appellant filed its motion for a new trial, which was overruled, and this appeal in error resulted.

The defendant has filed six assignments of error, the first two of which raise the general proposition that there was no evidence to justify submission of the case to the jury and therefore, it was error for the trial Court to overrule defendant's motion for a directed verdict made at conclusion of all the proof, which motion was predicated upon the ground there was no evidence that the defendant owned or controlled the tractor which was towing a trailer.

In order to properly discuss these two assignments of error, it will be necessary for us to give a detailed summary of the evidence in the case which is material to the question presented by these assignments.

The plaintiff owned several commercial vehicles, including a tractor-trailer rig which, at the time of the accident on March 26, 1964, was being operated and driven by plaintiff's employee, one William Eugene Burke, on highway 70.

At the point where the accident occurred the highway was steep and winding and consisted of only two traffic lanes, one for westbound traffic and one for eastbound traffic. Plaintiff's driver was proceeding in a westerly direction enroute from Asheville, North Carolina, to Knoxville, Tennessee.

As plaintiff's driver was going around a curve in the highway he met two more tractor-trailer rigs proceeding in an eastwardly direction on said highway and succeeding in passing the first one without difficulty, but the second rig crossed the center line, coming over to plaintiff's side of the highway and, in order to avoid a collision, plaintiff's driver pulled to the right, with a portion of his rig getting on the shoulder of the highway as a result of which the shoulder collapsed and plaintiff's tractor-trailer rig was upset and damaged.

Burke testified that the tractor which was pulling the trailer that forced him off the highway was painted red and was an H-67 Series Mack Cab-Over-Engine tractor.

He further testified that he saw no identifying numbers or lettering on the tractor but that he did see a red diamond shaped figure in the center part of the front of the trailer with the letters "T.C.T." in the diamond shaped figure; that he had seen this identification symbol many times before and it was same markings which appeared on other trailers owned by the Tennessee-Carolina Transportation Company.

Plaintiff, Clyde Fuller, also testified but he was not present when the accident occurred and his testimony sheds no light on the question raised by these two assignments.

Albert L. Johnson, traffic manager for the defendant, Tennessee-Carolina Transportation Company, testified that in March of 1964, the defendant was operating its equipment over U. S. Highway 70 between Knoxville, Tennessee, and Asheville, North Carolina, and had been doing so since 1949.

He testified that in March of 1964 all of the trailers that were operated by defendant under its name were owned by defendant, but as a business practice, the defendant constantly interchanged equipment with other carriers. Specifically, his testimony on this subject was as follows:

"Q. Now, Mr. Johnson, are you familiar with a practice in the industry called 'equipment interchange'?

A. Yes, sir.

Q. Now, Mr. Johnson, I'm not a trucker, and I want you to just explain this practice to me to the Jury in nontechnical simple terms, if you would?

A. All common carriers, of course, own tractors and trailers. Regularly, on a day by day basis truck companies interchange their trailers with other truck companies.

Q. Excuse me, let me interrupt there. Do they interchange tractors?

A. No, Sir.

Q. Okay, go ahead.

A. Trailers only. The reason for this, and it's very popular practice and becoming more so, is to eliminate the cost of transfer of the freight on that particular trailer, assuming it is a full trailer load. We have— or company has approximately 600 trailers of its own, but yet in our day to day operations, we will have 20 to 25 per cent, at least, of what we call 'off-lines' or

other truck companies trailers. So we're pulling other truck companies' trailers and other truck companies are pulling our trailers.

Q. What this is, as I understand it, and see I understand it right, Mr. Johnson, the American Trucking Association prescribes rules for this sort of thing?

A'. We have a special committee set up under American Trucking Association called 'The Interchange Equipment Committee' which draws up certain rules and specifications of equipment and prescribes the daily rental that one carrier will pay the other in the event he had to swap trailer for trailer.

Q. All this is then, if I understand it right, and check and be sure I do, is a kind of regulated swap back and forth proposition?

A. Yes, Sir, very similar to the railroads."

(B. of E. pp. 53, 54)

\* \* \* \* \* \*

"Q. Now, assume, Mr. Johnson, that TCT gets an order to take a trailer load of shirts from Woodbury, say, to the naval depot of Mechanicsburg, Pennsylvania, and there is no specification made on the routing or anything like that, and yet you can't operate, your rights don't let you go to Mechanicsburg, Pennsylvania. How would you handle that?

MR. McCARLEY: If Your Honor please, I don't see the relevance of this particular line of questioning to the accident involved in this law suit, and I object.

THE COURT: Overrule the objection.

MR. McCARLEY: Note our exception.

MR. BINKLEY: Go ahead, Mr. Johnson.

A. In absence of what we call a specific routing, which would be instructions to give it to a particular named truck line at a particular point where we serve, we would first determine what carrier, interchange carrier, that we had that would make Mechanicsburg, Pennsylvania, and in the event—there again, if unrouted, I could take it from Woodbury to Nashville and interchange it; I could take it from Woodbury to Knoxville, Asheville, Charlotte or Greensboro, North Carolina and interchange it. If it was unrouted, it would be in—what would control where would be its most economically advantageous to us from an operating standpoint. We could easily interchange it right in Nashville with Mason-Dixon line.

Q. And then they would pick it up in Nashville, if you did that, and take that same trailer all the way to Pennsylvania?

A. Yes, Sir.

Q. Now, Mr. Johnson, suppose you did interchange in Nashville? You have the right to operate between here and Knoxville, don't you?

A. Yes, Sir.

Q. So, do I understand now that a Mason-Dixon tractor would be pulling a TCT trailer over a route be-

tween here and Knoxville that you have a right to operate over?

A. Yes, Sir.

(B. of E. pp. 56-57)

\* \* \* \* \* \*

"Q. Mr. Johnson, is TCT the only line with ICC rights to operate over Highway 70 between Knoxville and Asheville?

A. No, Sir.

Q. So you've got competition in there?

A. We have considerable amount of competition."

(B. of E. pp. 65, 66)

He further testified that pursuant to Interstate Commerce Commission regulations the defendant's drivers made trip records, some of which were known as "logs", and these "logs" were preserved for a period of one year and then discarded. Therefore, the "logs" for the period of time in which the accident occurred had been discarded, since this suit was not filed until more than a year after the accident occurred and he had no knowledge of the occurrence of the accident until suit was filed. He also testified that he was unable to find any other trip records which included the time and place of this accident.

The above named witnesses are the only persons who testified in the case and the foregoing is, in substance,

all the evidence which needs to be considered by us in determining whether the trial Court should have directed a verdict for the defendant.

As has been held in numerous cases, the rule for determining a motion for directed verdict requires the trial Judge and the reviewing Court on appeal to look to all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. General Motors Corp. v. Dodson (1960), 47 Tenn.App. 438, 338 S.W.2d 655; Poole v. First Nat. Bank (1946), 29 Tenn.App. 327, 196 S.W.2d 563; Phillips v. Newport (1945), 28 Tenn. App. 187, 187 S.W.2d 965 and many other cases.

Likewise, and in reverse order, it is true that where there is no material and determinative evidence to support a verdict for the opponent of the motion it must be sustained. Cude v. Culberson (1947), 30 Tenn.App. 628, 209 S.W.2d 506; Camurati v. Sutton (1960), 48 Tenn. App. 54, 342 S.W.2d 732, Nicholas v. Provident Life & Accident Ins. Co. (1970), 61 Tenn.App. 633, 457 S.W.2d 536.

■ By material evidence, is meant evidence material to the question in controversy, which must necessarily enter into consideration of the controversy and by itself, or in connection with other evidence, is determinative of the case. Cude v. Culberson, supra; Knoxville Traction Co. v. Brown (1905), 115 Tenn. 323, 89 S.W. 319.

Although the accident occurred in North Carolina, neither party insists that the law of North Carolina, instead of the law of Tennessee, is applicable. Therefore, it is reasonable for us to assume that the plaintiff is relying upon the statutory presumption created by T.C.A. 59-1037, which is as follows:

"59-1037. *Prima facie evidence of ownership of automobile and use in owner's business.*—In all actions for injury to persons and/or to property caused by the negligent operation or use of any automobile, auto truck, motorcycle, or other motor propelled vehicle within this state, proof of ownership of such vehicle, shall be prima facie evidence that said vehicle at the time of the cause of action sued on was being operated and used with the authority, consent and knowledge of the owner in the very transaction out of which said injury or cause of action arose, and such proof of ownership likewise shall be prima facie evidence that said vehicle was then and there being operated by the owner, or by the owner's servant, for the owner's use and benefit and within the course and scope of his employment. This section is in the nature of remedial legislation, and it is the legislative intent that it be given a liberal construction."

The uncontroverted testimony of plaintiff's driver establishes the fact that the trailer which was being towed by the truck tractor which forced plaintiff's vehicle off the highway bore the name and identifying symbol of defendant. From this fact it could be inferred that the defendant was the owner of this trailer.

In addition to this fact, the following facts and circumstances also appear in the evidence:

(1) The defendant's trailer was being towed by a Mack-Cab-over-engine tractor, the color of which was red; (2) at the time of accident the defendant owned several Mack-Cab-over-engine tractors which were red; (3) the defendant frequently interchanged trailers with other common carriers; (4) the dispatch records of defendant were not available at the time this case was tried; and (5) many other common carriers, including the plaintiff, also owned Mack tractors.

Now, the determinative question presented to us is this:

Could the jury use the inferred fact that the defendant owned the trailer as a basis upon which to build a further inference from the additional facts and circumstances and thereby infer that the tractor which was towing the defendant's trailer was also owned by the defendant?

We do not think so, in view of uncontroverted evidence that the defendant frequently interchanged trailers with other carriers.

In other words, with this evidence of interchange in the record, the inferred fact that the defendant owned the trailer could not be used as a basis for building a further inference that the defendant also owned the tractor.

If it were not for this uncontroverted fact of interchange, then a different and a more difficult question would be presented, but we do not decide that question here since it is not necessary for us to do so.

From the foregoing additional facts and circumstances, it could not be inferred that one of the defendant's trac-

tors was at the place where and the time when the accident occurred or that one of its tractors was not there at the time of the accident.

Neither could it be inferred from the combination of such additional facts and circumstances with the inferred fact of ownership, that it was more probable that one of defendant's tractors was at such place at the time of accident than it was probable that none of said tractors were at that place when the accident occurred.

So, under the evidence presented here there was only one determinative fact established and that was that the trailer was owned by defendant. But this is not enough to present to the jury the question of ownership of the tractor and so, when we apply the above stated rule for determining motions for directed verdicts, the evidence falls short of that which is required to make a jury question.

■ Proof of ownership of the trailer alone does not create the presumption provided by the Statute (59-1037) since that statute only applies to motor vehicles. Even if we construed the statute as liberally as possible, the provisions thereof could not be stretched so as to include a commercial type trailer or semitrailer which has no propelling or automotive power of its own.

Chapter 8 of Title 59, T.C.A. contains a list of definitions of many of the terms used in Chapter 19, of which 59-1037 is a part, and the definitions therein which are pertinent to this case contain the following:

" 'MOTOR VEHICLE'. Every vehicle which is self-propelled and every vehicle which is propelled by elec-

tric power obtained from overhead trolley wires, but not operated upon rails.''

'' 'TRUCK'. Every motor vehicle designed, used or maintained primarily for the transportation of property.''

'' 'TRUCK TRACTOR'. Every motor vehicle designed and used primarily for drawing other vehicles and not so constructed as to carry a load other than a part of the weight of the vehicle and load so drawn.''

Plaintiff cites McAmis v. Carlisle (1956), 42 Tenn.App. 195, 300 S.W.2d 59, in support of his insistence that the evidence was sufficient to submit the case to the jury on the question of ownership. The following quotation from the opinion in that case is sufficient to readily distinguish it from the case at bar:

"DeBord further testified that the truck which included a tractor and trailer bore Indiana license plates Nos. 12828 and 29761 respectively, *and that on each door of the tractor was painted I. V. Contract Truckers Incorporated,* and he further stated that Carlisle denied that he was working for any other concern.

Not only did the evidence show that the name of the defendant was printed on the doors of the truck, a fact sufficient to create an inference of ownership, but there was introduced in evidence by the plaintiff a certificate issued by the Bureau of Motor Vehicles of the State of Indiana showing the defendant's registration of ownership of the truck which, under our Statute, 'shall * * * be prima facie evidence that said vehicle

was then and there being operated by the owner or by the owner's servant for the owner's use and benefit and within the course and scope of his employment.' T.C.A. sec. 59-1038, Code 1932, sec. 2702. See also, T.C.A. sec. 59-1037, Code 1932, sec. 2701.'' (Emphasis supplied.) McAmis v. Carlisle, supra, pp. 202, 203, 300 S.W. p. 63.

Plaintiff also cites the Kentucky case of Webb v. Dixie-Ohio Express Co., Inc. (1942), 291 Ky. 692, 165 S.W.2d 539, but in that case the vehicle involved was a truck instead of a trailer.

In the Pennsylvania case of Fullerton v. Motor Express (1953), 375 Pa. 173, 100 A.2d 73, cited by plaintiff, the facts are not recited in minute detail, but the following quotation from the opinion indicates that the tractor also bore the defendant's name:

"The truck-tractor carried the name of Motor Express, and the trial Judge permitted the jury to infer from the markings or signs that the vehicle belonged to the defendant company and that it was being operated in the course of the company's business.'' Supra, p. 74.

In the North Carolina case of Knight v. Associated Transport, Inc. (1961), 255 N.C. 462, 122 S.E.2d 64, the defendant's name was "on the front of the trailer, on its side, and on the door of the tractor.''

In another Pennsylvania case, Sefton v. Valley Dairy Co. (1942), 345 Pa. 324, 28 A.2d 313, cited by plaintiff, the vehicle involved was not a tractor-trailer rig, but was a milk delivery truck with the defendant's milk bottles inside.

None of the above mentioned cases cited by plaintiff are applicable here for the obvious reason that the determinative facts therein differ in material respects from those in the instant case.

No case from Tennessee or elsewhere has been cited by either of the parties in which the facts are sufficiently similar to those in the instant case so as to be controlling here.

However, by independent research, we have found a case decided by the Supreme Court of Pennsylvania in which the facts determining ownership very closely resemble those in the instant case:

That case is Fuller v. Palazzolo (1938), 329 Pa. 93, 197 A. 225, and we quote therefrom as follows:

"Appellee's proposition is that the presence of the Fruehauf Trailer Company's manufacturers' and dealers' license plates on the semitrailer, coupled with evidence that this defendant was a manufacturer of semitrailers and the fact that this semitrailer was being transported for the purpose of completion, were sufficient to take the question of the trailer company's responsibility for the accident, to the jury. This proposition we must reject."

\* \* \* \* \* \*

"It is obvious that when an inert steam locomotive is carried in a train of cars, it is only so much freight, even though it does run on its own wheels. Likewise, when an inert 'automobile' or 'trailer' is being towed

by an 'automotive vehicle,' as in the case at bar, it is only so much freight even though it does run on its own wheels. In that case, a license tag on the inert vehicle merely announces the registration of that piece of freight. It raises no presumption that the driver of the motor vehicle which is 'towing' or carrying the 'freight' is an employee of the owner of the freight, i. e., the towed vehicle, and is subject to his control. No such presumption arises for such a presumption would, except in rare cases, be contrary to the facts of human experience. If a man's car breaks down on the highway and he engages a towing company to 'tow' his car to a repair shop, the towing company is ordinarily an independent contractor, and its employees are not the employees of the man who is having his car towed." Supra, pp. 230, 231.

We think the reasoning of the Pennsylvania Court in Fuller v. Palazzolo, supra, is basically sound.

■ Therefore, the presumption created by T.C.A. 59-1037 does not apply to this case and the first and second assignments of error must be sustained.

All the other four assignments of error are directed to the trial Court's instructions to the jury. In view of the disposition which we are making of this case, it is unnecessary for us to consider the third, fourth, fifth and sixth assignments and they are pretermitted.

The judgment of the trial Court is reversed and the suit dismissed. The plaintiff-appellant will pay all of the Court costs, including the costs of this appeal.

Shriver, P.J.(M.S.), and Todd, J., concur.