KIMBERLY ROSS,

   Plaintiff/Appellant,

v.

VANDERBILT UNIVERSITY
MEDICAL CENTER,

   Defendant/Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

Appeal No.
M1999-02644-COA-R3-CV

Davidson Circuit
No. 95C-1770

**FILED**

February 18, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE THOMAS W. BROTHERS, JUDGE

JOE BEDNARZ, SR.
JOE BEDNARZ, JR.
Bednarz & Bednarz
Suite 1400, Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee 37219
  ATTORNEYS FOR PLAINTIFF/APPELLANT

STEVEN E. ANDERSON
ANNE E. S. HAMER
Bass, Berry & Sims
2700 First American Center
Nashville, Tennessee 37238-2700
  ATTORNEYS FOR DEFENDANT/APPELLEE

AFFIRMED AND REMANDED

WILLIAM B. CAIN, JUDGE

O P I N I O N

   The issues in this case are based upon the trial court's charge to the jury involving the sudden emergency doctrine. On appeal, we find no error in the jury instructions. Accordingly, we affirm the decision of the trial court in all respects.

# I. Facts

This case began with a minor injury which brought Plaintiff, Kimberly Ross, to the emergency room at Defendant, Vanderbilt University Medical Center. In June of 1994, Plaintiff visited Defendant's emergency room after having cut her finger with a knife. After determining that Plaintiff's wound required suturing, Dr. Lisa Morgan injected Plaintiff's finger with Lidocaine in order to numb it. Almost immediately thereafter, Plaintiff, who was lying on a gurney, complained that she felt ill and her arm jerked up and her eyes rolled back in her head. Dr. Morgan testified that she walked about four feet across the room toward the door, yelled for help, and then returned at which point Plaintiff's body began to jerk. Dr. Morgan put her body over Plaintiff's body. Despite Dr. Morgan's actions, Plaintiff fell off the gurney on which she lay and onto the floor head first. Dr. Morgan remembered it taking only a couple of seconds before other medical staff arrived too late to help her keep Plaintiff from falling. After Plaintiff fell, she was stabilized by Dr. Morgan along with Dr. Seth Wright, the attending physician on duty, and other emergency department staff members.

Dr. Wright subsequently diagnosed Plaintiff as having suffered from a vasovagal reaction which occurs when a person's blood pressure abruptly lowers. Vasovagal reactions are often accompanied by a fainting episode and can, if a person faints, be accompanied by jerking movements that resemble seizures. In his deposition testimony entered at trial, Dr. Wright explained the vasovagal reaction as a stress phenomenon and gave as typical examples a medical student falling over at the sight of his or her first autopsy and a person standing up suddenly after lying down for a week. He said that a vasovagal reaction can occur for no reason at all even while someone is standing in line at the grocery store. He stated that, though he saw a lot of hospital patients and visitors grow faint, a fainting episode is "really uncommon" for someone who is lying on a stretcher. Moreover, only ten to thirty percent of those that faint during a vasovagal reaction also experience convulsions.

Following her fall in Defendant's emergency room, Plaintiff experienced changes in personality and problems with her memory and dexterity. She was eventually diagnosed with a traumatic brain injury as a result of her fall in the emergency room. A year after the accident, Plaintiff filed a lawsuit alleging medical malpractice and medical battery. Defendant never filed a written answer. However, prior to trial, defense counsel stated that Defendant

would not be relying on any affirmative defenses. This case went to trial on both the claims of medical malpractice and battery. Following Plaintiff's proof, the trial court dismissed the battery claim upon Defendant's Motion for Directed Verdict.

Regarding the medical malpractice claim, Defendant offered the proof of Dr. Don Hasty, a board certified emergency room physician who had practiced at Baptist Hospital in Nashville for the past 28 years. He opined that Dr. Morgan had complied with the standard of care in treating Plaintiff. He emphasized how unlikely it would be for a vasovagal reaction, or a fainting spell, to be accompanied by seizure-like activity. He stated that he had seen this occur no more than five or six times in his career. Dr. Hasty concluded that it was appropriate for Dr. Morgan to walk three of four steps away to obtain help for two reasons: first, Dr. Morgan was significantly outweighed by the patient and, second, the patient appeared to be developing seizure-like activity which often requires more than one person to keep a patient on a gurney. He explained that it would not have been easy for Dr. Morgan to put up the bed rails and that the damage would likely have been done by the time she could get them up.

The deposition testimony of Dr. Seth Wright was read into evidence at trial. Dr. Wright's duties at Vanderbilt included practicing emergency medicine, teaching emergency medicine and serving as Director of Research of the Emergency Department. With regard to Dr. Morgan's treatment of Plaintiff, Dr. Wright opined that Dr. Morgan complied with the standard of care and stated that he would not have acted in any different way. It was his position that appropriate precaution to avoid seizure-like activity was taken prior to suturing Plaintiff. In light of Plaintiff's response to being injected, Dr. Wright felt that Dr. Morgan acted appropriately by calling for help immediately and attempting to protect the patient.

Plaintiff's expert, Dr. Richard Karsh, testified that he currently worked as a diagnostic radiologist but that he had experience and board certification in pediatric cardiology. He had not worked as a designated emergency room physician since 1981 when he moonlighted in an emergency room. He felt qualified as an expert in this case because his opinions were not those involving detailed aspects of emergency medical care but rather the aspects of overall patient treatment within the scope of an emergency room in which he did have personal experience.

Dr. Karsh agreed that Plaintiff had experienced a vasovagal reaction to

3

the needle stick. It was Dr. Karsh's opinion that "Dr. Morgan violated the acceptable standards of care by leaving the bedside when the patient was clearly losing consciousness and at significant risk of falling off the gurney. And that is leaving the patient, even ever so briefly, without making an effort to raise the bed rails which more than likely would have prevented her from falling off the gurney had the bed rails been successfully raised." Dr. Karsh did not think that Dr. Morgan should have put up the bed rails before suturing Plaintiff because her reaction, an unusual one, would not have been anticipated. He agreed that raising the bed rails could possibly take twenty seconds. When asked whether Dr. Morgan was faced with a sudden or unexpected emergency, Dr. Karsh responded, "[a]bsolutely." He also agreed that she was faced with "a snap judgment decision as to what to do."

At the close of the proof, the trial court charged the jury in relevant part as follows:

> In performing professional services for a patient, a physician has the duty to have that degree of learning and skill ordinarily possessed by physicians of good standing, practicing in the same or similar community and under similar circumstances and must use reasonable care to avoid causing injury to the patient.
>
> A physician has the duty to use the care and skill ordinarily exercised in similar cases by reputable members of the physician's profession practicing in the same or a similar community under similar circumstances. A physician's best judgment must be used with reasonable diligence in the exercise of skill and the application of the physician's learning, in an effort to accomplish the purpose for which the physician is employed.
>
> A physician who is a specialist in a particular field or practices a particular specialty has the duty to possess and exercise that degree of skill, care, and learning ordinarily possessed and exercised in similar cases by members in good standing of the physician's profession who specialize in the same field and practice in the same or similar locality.

In addition, the court granted Defendant's request to charge the jury with the Sudden Emergency Doctrine. Over Plaintiff's objections, the judge charged the jury as follows:

> A physician who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy of judgement as a physician acting under normal circumstances who has time to think and reflect before acting. A physician faced with a sudden emergency is required to act as a reasonable careful physician placed in a similar position. A sudden emergency, however, will not excuse the actions of a physician whose own negligence created the emergency.

4

If you find there was a sudden emergency that was not caused by any fault of the physician whose actions you are judging, you must consider this factor in determining and comparing fault.

The jury returned a verdict in favor of Defendant finding that Dr. Lisa Morgan did not deviate from the recognized standard of acceptable professional practice for her profession and specialty in this community in her treatment of Plaintiff.

## II. ISSUES

### A.

The main issue in this case is brought about by the ongoing effort of our courts to resolve certain pre-*McIntyre* doctrines in accord with a system of comparative fault. Specifically at issue is the sudden emergency doctrine which has been addressed by the supreme court on two occasions since the adoption of comparative fault. First, in *Eaton v. McClain*, 891 S.W.2d 587 (Tenn. 1994), the court took the opportunity to provide trial courts with some guidance as to how to apportion fault between parties. In so doing, the court stated, as dicta, that "[t]he policy considerations underlying . . . the doctrine of contributory negligence . . . have been implicitly subsumed by our decision in *McIntyre* and should also impact the jury's apportionment of fault between the parties in an appropriate case." *Id.* at 592. The court proceeded to say that "[i]n summary, the percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: . . . the existence of a sudden emergency requiring a hasty decision." *Id.*

Again, in *McCall v. Wilder*, 913 S.W.2d 150 (Tenn. 1995), the sudden emergency doctrine was addressed and was, this time, actually at issue in a case involving an automobile accident. The defendant, the administrator of the decedent's estate, alleged that the accident was an unavoidable consequence of a sudden emergency created when the decedent suffered a seizure while driving. The court of appeals had upheld the trial court's grant of summary judgment reasoning "that the case fell within the 'established principles in this state that an automobile accident resulting from an unavoidable sudden emergency, such as an epileptic seizure, negates negligence.' " *Id.* at 152. The supreme court vacated the award of summary judgment holding that "[t]he doctrine no longer constitutes a defense as a matter of law but, if at issue, must be considered as a factor in the total comparative fault analysis. Accordingly, the doctrine of

5

sudden emergency does not negate defendant's liability in the case before us as a matter of law." *Id.* at 157. In so holding, the court quoted *Eaton* stating that "[t]he sudden emergency doctrine . . . has now been subsumed into Tennessee's comparative fault scheme." *Id.* (citations omitted).

Plaintiff relies on these cases to support her contention that the trial court erred by charging sudden emergency in a situation where Defendant never alleged comparative fault. In other words, Plaintiff is asserting that in a context where comparative fault is not at issue, the sudden emergency doctrine is abolished. To the extent that Plaintiff is relying on *Eaton* and *McCall* to support her position that the sudden emergency doctrine does not come into play unless a plaintiff is allegedly at some fault, we disagree with Plaintiff's interpretation of these cases.

The sudden emergency doctrine "recognizes that a person confronted with a sudden or unexpected emergency which calls for immediate action is not expected to exercise the same accuracy of judgment as one acting under normal circumstances who has time for reflection and thought before acting." *McCall*, 913 S.W.2d at 157 (citations omitted). In the past, this doctrine has been presented by plaintiffs who were confronted with sudden emergencies as the basis for relieving them from the harsh consequences of contributory negligence. *Irvin v. City of Kingsport*, 602 S.W.2d 495 (Tenn. Ct. App. 1980); *see also Kowalski v. Eldridge*, 765 S.W.2d 746 (Tenn. Ct. App. 1988) (considering and reversing a trial court's holding that the plaintiff was excused from his negligence due to the sudden emergency doctrine after concluding that there was no sudden emergency in this case). In addition, the doctrine has been relied upon by defendants confronted with sudden emergencies in an effort to defend on the issue of their negligence. *McCall*, 913 S.W.2d at 157; *London v. Stepp*, 56 Tenn. App. 161, 405 S.W.2d 598, 609 (1965).

As articulated in *Eaton* and *McCall*, the adoption of a comparative fault scheme modifies the way that the sudden emergency doctrine operates as applied to both plaintiffs and defendants seeking to rely on the doctrine. Specifically with regard to plaintiffs, the doctrine is no longer needed as an exception to contributory negligence to ameliorate the plaintiff's claim. Rather, the circumstances taken into account by this doctrine are now some of many considerations to be addressed when assessing relative degrees of fault. *Eaton*, 891 S.W.2d at 592.

As for defendants, prior to *McIntyre*, the sudden emergency doctrine

6

constituted a defense as a matter of law if properly established by the defendant. *McCall*, 913 S.W.2d at 157 ("[t]he doctrine no longer constitutes a defense as a matter of law"). Now, it is only a factor in the total fault analysis. *Id.* This is true in a comparative fault analysis when both parties are allegedly at fault. It is likewise true when the analysis is only of the defendant's fault because, as in the case at bar, there has been no allegation that the plaintiff was at fault.

We acknowledge that there is confusing language in *McCall* upon which Plaintiff could rely in maintaining that the sudden emergency doctrine does not come into play unless a plaintiff is allegedly at some fault. Specifically, the court stated "[t]he doctrine no longer constitutes a defense as a matter of law but, if at issue, must be considered as a factor in the total *comparative fault* analysis." *Id.* (emphasis added). However, the court cannot have intended to hold that the doctrine is only applicable in a comparative fault situation particularly in light of the fact that *McCall* does not involve a comparative fault situation: only the defendant was allegedly at fault in *McCall*. We therefore hold that the trial court did not err by charging the sudden emergency doctrine in a situation where Defendant had not alleged comparative fault.

**B.**

Likewise, we disagree with Plaintiff's claim that the trial court charged the jury with an instruction which provided Defendant with a defense as a matter of law. As established above, such a jury instruction would be improper under *McCall*. However, Defendant never argued that the sudden emergency doctrine constituted a complete bar to recovery, and the trial court's instruction certainly cannot be interpreted that way. The trial court's jury charge was as follows:

> A physician who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy of judgment as a physician acting under normal circumstances. . .
>
> If you find there was a sudden emergency that was not caused by any fault of the physician whose actions you are judging, you must consider the factor in determining and comparing fault.

This instruction in no way communicates that a sudden emergency operates as a complete defense to a claim. Rather, in keeping with *McCall*, this charge indicates that a sudden emergency is but one factor that must be considered in the jury's determination of the fault of a party, here Defendant.

7

## C.

In her next argument, Plaintiff argues that the sudden emergency doctrine is not applicable in a medical malpractice case to lower the standard of acceptable professional practice required of an emergency room physician. It is Plaintiff's position that the circumstances underlying the sudden emergency doctrine are already taken into account due to the fact that Dr. Morgan was practicing emergency medicine in an emergency room setting. Thus, Plaintiff complains that the sudden emergency instruction in the case operates to excuse Dr. Morgan's lack of the requisite training, skill and judgment.

The standard of care in a malpractice action is defined in part as "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices." Tenn. Code Ann. § 29-26-115(a)(1). In emergency medicine, "[t]he specialist . . . is trained in problems commonly encountered in emergency departments." Dan J. Tennenhouse, *Attorneys Medical Deskbook 3D* § 7.8 (1993). "[M]ost emergency rooms . . . treat[] a broad range of medical conditions, from life-threatening trauma, to chest pain, to routine health evaluations." Erik J. Olson, *No Room at the Inn: A Snapshot of an American Emergency Room*, 46 Stan. L. Rev. 449, 453 (1994).

The underlying concept of negligence is an expectation that people exhibit reasonably prudent conduct in light of all their circumstances. *See Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990) (citing *Dixon v. Lobenstein*, 175 Tenn. 105, 132 S.W.2d 215 (1939)); *Grady v. Bryant*, 506 S.W.2d 159, 161 (Tenn. Ct. App. 1973). As those circumstances differ, so does reasonably prudent conduct. The sudden emergency "doctrine recognizes that when an actor is faced with a sudden and unexpected circumstance which leaves little or no time for thought, deliberation or consideration, or causes the actor to be reasonably so disturbed that the actor must make a speedy decision without weighing alternative courses of conduct, the actor may not be negligent if the actions taken are reasonable and prudent in the emergency context." *Rivera v. New York City Transit Auth.*, 569 N.E.2d 432, 434 (N.Y. 1991). While care in an emergency room may involve circumstances that require physicians to make immediate decisions without time for deliberation, it often does not. Indeed, "[i]n a 1991 internal study [of the emergency room at a 665-bed nonprofit community hospital in Southern California], the emergency room administrators found that 14 percent of all emergency room visits involved emergency conditions--medical complaints requiring immediate evaluation or treatment by

a physician." Erik J. Olson, *No Room at the Inn: A Snapshot of an American Emergency Room*, 46 Stan. L. Rev. 449, 453 (1994).

The problem with Plaintiff's argument is that it assumes that the practice of emergency medicine necessarily involves sudden and unexpected circumstances which leave no time for thought, deliberation or consideration. Plaintiff's own medical situation disproves her argument: she came to Defendant's emergency room with a cut finger, the treatment of which apparently did not require that a doctor make a speedy decision without weighing alternative courses of conduct. Once in Defendant's emergency room, the emergency that justified the sudden emergency instruction was not Plaintiff's cut finger, but her vasovagal reaction to being given a shot. There was testimony that Plaintiff's reaction was both sudden and unexpected. The circumstance that underlies the sudden emergency doctrine, the existence of a sudden or unexpected emergency which calls for immediate action, was only present because Plaintiff experienced the vasovagal reaction. We therefore find that, under the appropriate facts, the sudden emergency doctrine may and should be applied in the assessment of the fault of an emergency room doctor.

**D.**

Finally, we address the factual question of whether or not there was a sudden emergency in this case. Factual findings of a jury in a civil action shall be set aside only if there is no material evidence to support the verdict. Tenn. R. App. P 13(d). "Appellate courts do not re-weigh the evidence when a party challenges the evidentiary support for a verdict." *Smith County v. Eatherly*, 820 S.W.2d 366, 369 (Tenn. Ct. App.1991). Rather, "[t]his Court on appeal is required to take the strongest legitimate view of the evidence favoring the prevailing party, discard all contrary evidence, allow all reasonable inferences to uphold the jury's verdict and set aside the jury verdict only when there is no material evidence to support it." *Witter v. Nesbit*, 878 S.W.2d 116, 121 (Tenn. Ct. App. 1993).

We find that there is material evidence that Dr. Morgan was faced with a sudden emergency. Both Dr. Hasty and Dr. Wright testified at length that, while seizures do occur in the emergency room, it is highly unusual for a patient to suffer seizure-like activity from a vasovagal reaction. Dr. Wright added that such a reaction is even more unlikely to occur with someone who is lying down. Even Plaintiff's expert, Dr. Karsh, agreed that Dr. Morgan could not have anticipated such an unusual seizure-like activity and did nothing negligent to

9

cause Plaintiff's reaction. Dr. Karsh specifically agreed that Dr. Morgan was faced with a sudden and unexpected emergency and forced to make a "snap judgment decision." In light of the overwhelming amount of testimony indicating that Dr. Morgan was faced with a sudden emergency, we find that the trial court was correct to instruct the jury with this doctrine.

## III. Conclusion

The principles underlying the sudden emergency doctrine must be considered by triers of fact who are assessing the fault of either defendants, plaintiffs, or both. This is true when those charged with fault are staff members in an emergency room setting who are "confronted with a sudden or unexpected emergency which calls for immediate action." In this case, there was abundant evidence of such a sudden and unexpected emergency calling for immediate action. We therefore affirm the trial court in all respects.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE

_____
PATRICIA J. COTTRELL, JUDGE

10