IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2007 Session

KATHERINE DELORIESE OLINGER, ET AL. v.
UNIVERSITY MEDICAL CENTER, ET AL.

Appeal from the Circuit Court for Wilson County
No. 12423    John D. Wootten, Jr., Judge

No. M2006-02312-COA-R3-CV - Filed January 17, 2008

This medical malpractice action was filed by Katherine Deloriese Olinger and Perry Michael Hale ("Plaintiffs") after their son was born with brachial plexus palsy. Plaintiffs claim the injury occurred because the defendants failed to take the proper medical steps to resolve a delivery complication known as shoulder dystocia. Following a trial, the jury returned a verdict in favor of all of the defendants. Plaintiffs appeal claiming the Trial Court erred when it gave a jury instruction on the sudden emergency doctrine, and further erred by refusing to permit cross-examination of a witness by the use of medical literature which Plaintiffs maintain had been established as a reliable authority pursuant to Tenn. R. Evid. 618. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and ROSS H. HICKS, SP. J., joined.

David R. Smith and Edmund J. Schmidt, III, Nashville, Tennessee, for the Appellants, Katherine Deloriese Olinger and Perry Michael Hale, individually and as next friends of Michael Eugene Hale, a minor.

John F. Floyd and Mandy Langford, Nashville, Tennessee, for the Appellee, StarMed Health Personnel, Inc.

C. Bennett Harrison, Jr., and Brian W. Holmes, Nashville, Tennessee, for the Appellee, Charles B. Lanning, Jr., M.D.

Mark T. Smith and Andrée Sophia Blumstein, Nashville, Tennessee, for the Appellee, National Medical Hospital of Wilson County, Inc., d/b/a University Medical Center.

# OPINION

## Background

This is a medical malpractice action surrounding the birth of Michael Eugene Hale ("the Child"), who was permanently injured when he was born on September 27, 2000. The lawsuit was filed by the child's parents against the University Medical Center in Lebanon, Tennessee, as well as Charles B. Lanning, Jr., M.D., and StarMed Health Personnel, Inc. ("StarMed"). StarMed employed Sheila Sturgill, R.N., who was the nurse involved in the delivery.

Dr. Lanning was the treating gynecologist and obstetrician for the birth of plaintiff Katherine Olinger's first child. Ms. Olinger's first child was born without complications in August of 1995. When Ms. Olinger became pregnant with her second child in 1999, Dr. Lanning again served as her treating gynecologist and obstetrician. Ms. Olinger was admitted to the University Medical Center for delivery of her second child, Michael Eugene Hale. A complication known as shoulder dystocia occurred during the delivery. Shoulder dystocia occurs after the head of the infant is delivered and one of the infant's shoulders then becomes lodged under the mother's pubic bone. The Child suffered significant and permanent damage to his right arm as a result of the shoulder dystocia. He was diagnosed with brachial plexus palsy and has since undergone several surgical procedures.

After this litigation progressed and the issues were narrowed, the case proceeded to trial solely on the issues relating to the conduct of Dr. Lanning and Nurse Sturgill once they were confronted with the shoulder dystocia. Plaintiffs essentially claim that had Dr. Lanning and Nurse Sturgill acted in a medically reasonable manner in accordance with the acceptable standard of professional practice, their son would not have suffered any injuries. We note that as the delivery of the Child was videotaped, the jury was able to assess the testimony of the witnesses in light of what the jury could see on the videotape.

The defendants filed a motion in limine before the trial seeking to exclude the testimony of Plaintiffs' expert witness, Dr. Bruce Bryan. The defendants claimed, *inter alia*, that Dr. Bryan's testimony did not satisfy the locality rule. The Trial Court denied the motion in limine and permitted Dr. Bryan to testify at trial via deposition.

One of Plaintiffs' allegations was that Nurse Sturgill improperly applied fundal pressure during the delivery. Fundal pressure is pressure on the mother's abdomen. Plaintiffs claimed the fundal pressure should not have been applied and caused or contributed to the Child's injuries. At trial, Plaintiffs sought to cross-examine Nurse Sturgill using an article which they argue had been established as a reliable authority during the testimony of one of Plaintiff's expert witnesses. The defendants objected to this line of questioning for several reasons, and the Trial Court ultimately sustained the objection.

Prior to the jury being instructed, all of the defendants requested a jury charge on the sudden emergency doctrine. Plaintiffs strongly opposed such a charge. The Trial Court concluded

that there was sufficient proof in the record to permit a jury charge on sudden emergency, and the jury was so charged. The jury eventually returned a verdict for all defendants.

Plaintiffs raise two issues on appeal. First, Plaintiffs claim the Trial Court erred when it charged the jury on sudden emergency. Second, Plaintiffs claim the Trial Court erred when it precluded them from cross-examining Nurse Sturgill using certain medical literature which they argue had been established as a reliable authority. Defendants raise as a separate issue their position that the Trial Court erred in allowing Plaintiffs' experts, Dr. Bryan and Martha Eakes, R.N., to testify because their testimony did not satisfy the locality rule and was not scientifically reliable.

## **Discussion**

The recent case of *White v. Premier Medical Group*, No. M2006-01196-COA-R3-CV, 2007 WL 4207868 (Tenn. Ct. App. Nov. 28, 2007)[1] involved the propriety of a jury instruction in a medical malpractice case. In *White*, the defendants successfully sought to have the jury charged on the defense of superseding cause. *Id.*, at *3. Following a jury verdict in favor of the defendants, the plaintiffs claimed on appeal that the trial court erred in giving that particular instruction. We ultimately concluded that the jury instruction was appropriate. In so doing we discussed the requisite amount of proof needed to support a jury instruction and the applicable standard of review. We stated:

> It is proper for a court to charge the law upon an issue of fact within the scope of the pleadings upon which there is evidence, which even though slight, is "sufficient to sustain a verdict." *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Norman v. Fisher Marine, Inc.*, 672 S.W.2d 414, 421 (Tenn. Ct. App. 1984); *Ringer v. Godfrey*, 362 S.W.2d 825, 827 (Tenn. Ct. App. 1962); *Monday v. Millsaps*, 264 S.W.2d 6 (Tenn. Ct. App. 1953); *Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319, 1326 (6th Cir. 1992). For the evidence to be "sufficient to sustain a verdict," there must be evidence which is "material" to the issue. *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997); *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978); *City of Chattanooga v. Rogers*, 299 S.W.2d 660 (Tenn. 1956); *D.M. Rose & Co. v. Snyder*, 206 S.W.2d 897 (Tenn. 1947).
>
> The Tennessee Supreme Court has described "material evidence" as "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321

---

[1] At the time the present Opinion was released, the time in which to file a Tenn. R. App. P. 11 application for permission to appeal in the *White* case had not yet expired.

(Tenn. 1905); *Fuller v. Tennessee-Carolina Transp. Co.*, 471 S.W.2d 953, 956 (Tenn. Ct. App. 1970). Black's Law Dictionary defines "material evidence" as "evidence having some logical connection with the consequential facts or the issues." Black's Law Dictionary 459 (7th ed. 2000); *see Smith v. Tennessee Furniture Indus., Inc.*, 369 S.W.2d 721, 728 (Tenn. 1963). This Court has described "material evidence" to be "such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Sexton v. Anderson County*, 587 S.W.2d 663, 666 (Tenn. Ct. App. 1979)….

When determining whether there is material evidence sufficient to sustain a verdict, the appellate courts "do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict." *Reynolds*, 887 S.W.2d at 823. Instead, the appellate courts "are limited to determining whether there is material evidence to support the jury's verdict." *Id.* If we determine the record contains material evidence supporting the verdict, we are not to disturb the verdict. *Id.*

Accordingly, without judging the credibility of witnesses or weighing the evidence, we must determine whether there is any material evidence sufficient to sustain the defense of superseding cause. To make this determination, we must identify the superseding cause contended by Defendants and determine whether there is any material evidence in the record that pertains to each element of this defense.

*White*, 2007 WL 4207868, at *4 (footnote omitted). We also note that "[w]e should not set aside a jury's verdict because of an erroneous instruction unless it affirmatively appears that the erroneous instruction actually misled the jury." *Grandstaff v. Hawks*, 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000).

Our Supreme Court explained the sudden emergency doctrine in *McCall v. Wilder*, 913 S.W.2d 150 (Tenn. 1995) as follows:

The sudden emergency doctrine, which has now been subsumed into Tennessee's comparative fault scheme, *Eaton v. McLain*, 891 S.W.2d 587, 592 (Tenn. 1995), recognizes that a person confronted with a sudden or unexpected emergency which calls for immediate action is not expected to exercise the same accuracy of judgment as one acting under normal circumstances who has time for reflection and thought

-4-

before acting. *See Young v. Clark*, 814 P.2d 364, 365 (Colo. 1991); *see also Prosser and Keeton on the Law of Torts*, § 196.[2]

> The doctrine no longer constitutes a defense as a matter of law but, if at issue, must be considered as a factor in the total comparative fault analysis. Accordingly, the doctrine of sudden emergency does not negate defendant's liability in the case before us as a matter of law.

*McCall*, 913 S.W.2d at 157 (footnote in the original).

It is important to note that Plaintiffs challenge only whether the sudden emergency instruction should have been given in the first place. Plaintiffs do not claim that the instruction as given was legally deficient. The sudden emergency instruction given by the Trial Court in the present case was as follows:

> A physician/nurse who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy or judgment as a person acting under normal circumstances who has time to think and reflect before acting. A physician/nurse faced with a sudden emergency is required to act within the recognized standard of care applicable to that physician or nurse. A sudden emergency will not excuse the actions of a person whose own negligence created the emergency.

> If you find that there was a sudden emergency that was not caused by any fault of the persons whose actions you are judging, you must consider this factor in determining and comparing fault.

The defendants argue that the sudden emergency confronted by Dr. Lanning and the delivery room nurses was not the occurrence of shoulder dystocia, but the fact that the shoulder dystocia was not resolved after the typical steps used to resolve that complication failed. At trial, Dr. Lanning described shoulder dystocia and acknowledged that he has been trained to deal with that complication. Dr. Lanning testified that he has delivered "probably 4,000" babies over the course of his career as an obstetrician. Of those 4,000 deliveries, he encountered shoulder dystocia approximately 100 times. Dr. Lanning stated that the "McRoberts maneuver" and "suprapubic

---

[2] "[T]he basis of the rule is merely that the actor is left no time for adequate thought, or is reasonably so disturbed or excited that the actor cannot weigh alternative courses of action, and must make a speedy decision, based very largely upon impulse or guess. Under such circumstances, the actor cannot reasonably be held to the same accuracy of judgment or conduct as one who has had the full opportunity to reflect, even though it later appears that the actor made the wrong decision, one which no reasonable person could possible have made after due deliberation." *Prosser and Keeton on the Law of Torts*, § 196.

pressure" are the basic procedures used to resolve the shoulder dystocia. Suprapubic pressure is pressure applied above the pubic bone in the groin area. Suprapubic pressure is a proper procedure to help resolve shoulder dystocia. Suprapubic pressure is quite different from fundal pressure which, as mentioned previously, is pressure applied to the abdominal area. The jury was presented with conflicting testimony as to whether Nurse Sturgill did or did not apply fundal pressure. In short, Plaintiffs' proof was that she did and Defendants' proof was that she did not. Dr. Lanning described the McRoberts maneuver as follows:

> [The McRoberts maneuver is where] you take mom's legs or thighs, flex them back towards her abdomen, and then abduct them away from her abdomen, too. That decreases the angle between the spinal column and it's called a sacrum, it flattens you[r] angle out and makes the head, makes the shoulders deliver more easily. It also rotates the pubic bone back towards mom's head, and usually it relieves the shoulder dystocia. And it's successful almost 90 percent of the time, that and a combination of suprapubic pressure. And that goes along with my experience, too, that 99 out of 100 of mine were relieved with those two maneuvers.

When asked if an obstetrician can practice his entire career and not have to do maneuvers beyond the McRoberts maneuver and suprapubic pressure, Dr. Lanning stated that he "[a]lmost did." According to Dr. Lanning's testimony, if the McRoberts maneuver and suprapubic pressure do not resolve the shoulder dystocia, the next step is to perform intervaginal rotational maneuvers. The goal during intervaginal rotational maneuvers is to turn the baby and "once you get the shoulder out from under the pubic bone, the shoulders will deliver spontaneously, with the aid of some downward gentle traction." When Dr. Lanning performed the intervaginal rotational maneuver, he rotated the baby in a counterclockwise manner and the baby then came out "fast." Dr. Lanning described shoulder dystocia an "an obstetrician's nightmare" because it's "unpredictable … [and] unavoidable" and can result in death. Dr. Lanning added that in his 21 years of practicing medicine as an obstetrician, Ms. Olinger's delivery was the first time he encountered shoulder dystocia that was not resolved by the McRoberts maneuver and suprapubic pressure.

Dr. Joseph Bruner was called as an expert witness on behalf of Dr. Lanning. Dr. Bruner is board certified in obstetrics and gynecology. Dr. Bruner stated that he has had over 60 articles published during his medical career, including an article on shoulder dystocia. According to Dr. Bruner:

> [Shoulder dystocia] is a special situation, because it's an emergency situation, there are a number of steps or a number of maneuvers that have been devised over the years for dealing with it. Although no one maneuver has been shown to be better than any others or no combination of maneuvers has been shown to be better or safer, the basic standard of care is that when a physician or a midwife or whoever encounters a shoulder dystocia, they have to go through a

-6-

logical sequence of these steps to try to relieve the shoulder dystocia as safely as possible.…

[I]t's easiest to think of [the steps to relieve shoulder dystocia] in waves, so to speak. There are some that are really easy to do, and typically those are the ones that are done first. One is called the McRoberts maneuver … where you simply flex the woman's knees up onto her chest. This helps to flatten out the curve of the spine and it rotates the pelvic girdle forward to make more room for the delivery of the baby. The McRoberts maneuver is very easy to do because all you have to do is move the legs.

The second maneuver that can be done at the same time is suprapubic pressure. The pubic bone is right above your groin, and if you push above that bone, then in the case of a shoulder dystocia … if you're doing it correctly, pressing right on the shoulder of the baby. And this is also fairly easy to do. And, finally, if you need the room, you can perform an episiotomy.

Dr. Bruner added that these initial steps usually relieve the shoulder dystocia 90%-95% of the time. If those initial steps do not work, then you get into more complicated maneuvers, such as the Woods corkscrew maneuver, the Rubin maneuver, or the Zavanelli maneuver. Dr. Bruner also stated:

In an average practice in a community about [the size of Lebanon], the typical obstetrician would run into a shoulder dystocia maybe three or four times a year. Since almost all of them are resolved with the first few maneuvers, it's possible to go your entire career and never have to do more than, for example, the McRoberts maneuver and suprapubic pressure.

Dr. Bruce Bryan's deposition for proof was admitted at trial. Dr. Bryan testified as an expert witness on behalf of Plaintiffs. Dr. Bryan testified that shoulder dystocia can be very harmful to the child. It can cause death or brain damage because the umbilical cord can be depressed, thereby cutting off oxygen to the baby. Other dangers include broken bones and a brachial plexus injury. Dr. Bryan testified that shoulder dystocia occurs, on average, in three percent of all deliveries. Dr. Bryan added that the McRoberts maneuver and suprapubic pressure resolve shoulder dystocia in 90% of the cases. Dr. Bryan agreed that shoulder dystocia was a "medical emergency." Dr. Bryan admitted that he testified in another case as follows:

As far as the timing goes, when you start getting [a] couple [of] minutes and you don't have the baby delivered, you really start pushing hard because you've got about four or five minutes. And if you don't have the baby delivered by four, you are screwed, really screwed.

-7-

As stated, the defendants argue that the sudden emergency occurred when the McRoberts maneuver and suprapubic pressure failed to resolve the shoulder dystocia. Plaintiffs contend that as a trained physician, Dr. Lanning should have anticipated those initial steps not working and his then having to undertake additional maneuvers and, therefore, it was not a sudden emergency.

This Court had the opportunity to discuss the applicability of the sudden emergency doctrine in a medical malpractice case in *Ross v. Vanderbilt University Medical Center*, 27 S.W.3d 523 (Tenn. Ct. App. 2000). In *Ross*, the plaintiff went to the emergency room because of a cut on her finger. The emergency room physician, Dr. Morgan, injected the plaintiff's finger with Lidocaine in order to numb it. Then:

> Almost immediately thereafter, Plaintiff, who was lying on a gurney, complained that she felt ill and her arm jerked up and her eyes rolled back in her head. Dr. Morgan testified that she walked about four feet across the room toward the door, yelled for help, and then returned at which point Plaintiff's body began to jerk. Dr. Morgan put her body over Plaintiff's body. Despite Dr. Morgan's actions, Plaintiff fell off the gurney on which she lay and onto the floor head first. Dr. Morgan remembered it taking only a couple of seconds before other medical staff arrived too late to help her keep Plaintiff from falling.…
>
> Dr. Wright subsequently diagnosed Plaintiff as having suffered from a vasovagal reaction which occurs when a person's blood pressure abruptly lowers. Vasovagal reactions are often accompanied by a fainting episode and can, if a person faints, be accompanied by jerking movements that resemble seizures.… He stated that, though he saw a lot of hospital patients and visitors grow faint, a fainting episode is "really uncommon" for someone who is lying on a stretcher. Moreover, only ten to thirty percent of those that faint during a vasovagal reaction also experience convulsions.
>
> Following her fall in Defendant's emergency room, Plaintiff experienced changes in personality and problems with her memory and dexterity. She was eventually diagnosed with a traumatic brain injury as a result of her fall in the emergency room.

*Ross*, 27 S.W.3d at 525.

In discussing the sudden emergency doctrine, this Court rejected the plaintiff's argument that sudden emergency has no application when a defendant does not allege comparative fault on the part of the plaintiff. *Id.*, at 527-528. We then discussed the plaintiff's argument that the sudden emergency doctrine has no application in a medical malpractice case involving an emergency room doctor. More specifically, the plaintiff argued that there could be no sudden emergency in an

emergency room because the circumstances underlying the sudden emergency doctrine are already taken into account in an emergency room setting. We disagreed:

> The standard of care in a malpractice action is defined in part as "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices." Tenn. Code Ann. § 29-26-115(a)(1). In emergency medicine, "[t]he specialist ... is trained in problems commonly encountered in emergency departments." Dan J. Tennenhouse, *Attorneys Medical Deskbook 3D* § 7.8 (1993). "[M]ost emergency rooms ... treat[ ] a broad range of medical conditions, from life-threatening trauma, to chest pain, to routine health evaluations." Erik J. Olson, *No Room at the Inn: A Snapshot of an American Emergency Room*, 46 Stan. L. Rev. 449, 453 (1994).

> The underlying concept of negligence is an expectation that people exhibit reasonably prudent conduct in light of all their circumstances. *See Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990) (citing *Dixon v. Lobenstein*, 175 Tenn. 105, 132 S.W.2d 215 (1939)); *Grady v. Bryant*, 506 S.W.2d 159, 161 (Tenn. Ct. App. 1973). As those circumstances differ, so does reasonably prudent conduct. The sudden emergency "doctrine recognizes that when an actor is faced with a sudden and unexpected circumstance which leaves little or no time for thought, deliberation or consideration, or causes the actor to be reasonably so disturbed that the actor must make a speedy decision without weighing alternative courses of conduct, the actor may not be negligent if the actions taken are reasonable and prudent in the emergency context." *Rivera v. New York City Transit Auth.*, 569 N.E.2d 432, 434 (1991). While care in an emergency room may involve circumstances that require physicians to make immediate decisions without time for deliberation, it often does not. Indeed, "[i]n a 1991 internal study [of the emergency room at a 665-bed nonprofit community hospital in Southern California], the emergency room administrators found that 14 percent of all emergency room visits involved emergency conditions - medical complaints requiring immediate evaluation or treatment by a physician." Erik J. Olson, *No Room at the Inn: A Snapshot of an American Emergency Room*, 46 Stan. L. Rev. 449, 453 (1994).

> The problem with Plaintiff's argument is that it assumes that the practice of emergency medicine necessarily involves sudden and unexpected circumstances which leave no time for thought, deliberation or consideration. Plaintiff's own medical situation

-9-

disproves her argument: she came to Defendant's emergency room with a cut finger, the treatment of which apparently did not require that a doctor make a speedy decision without weighing alternative courses of conduct. Once in Defendant's emergency room, the emergency that justified the sudden emergency instruction was not Plaintiff's cut finger, but her vasovagal reaction to being given a shot. There was testimony that Plaintiff's reaction was both sudden and unexpected. The circumstance that underlies the sudden emergency doctrine, the existence of a sudden or unexpected emergency which calls for immediate action, was only present because Plaintiff experienced the vasovagal reaction. We therefore find that, under the appropriate facts, the sudden emergency doctrine may and should be applied in the assessment of the fault of an emergency room doctor.…

Finally, we address the factual question of whether or not there was a sudden emergency in this case. Factual findings of a jury in a civil action shall be set aside only if there is no material evidence to support the verdict.…

We find that there is material evidence that Dr. Morgan was faced with a sudden emergency. Both Dr. Hasty and Dr. Wright testified at length that, while seizures do occur in the emergency room, it is highly unusual for a patient to suffer seizure-like activity from a vasovagal reaction. Dr. Wright added that such a reaction is even more unlikely to occur with someone who is lying down. Even Plaintiff's expert, Dr. Karsh, agreed that Dr. Morgan could not have anticipated such an unusual seizure-like activity and did nothing negligent to cause Plaintiff's reaction. Dr. Karsh specifically agreed that Dr. Morgan was faced with a sudden and unexpected emergency and forced to make a "snap judgment decision." In light of the overwhelming amount of testimony indicating that Dr. Morgan was faced with a sudden emergency, we find that the trial court was correct to instruct the jury with this doctrine.…

The principles underlying the sudden emergency doctrine must be considered by triers of fact who are assessing the fault of either defendants, plaintiffs, or both. This is true when those charged with fault are staff members in an emergency room setting who are "confronted with a sudden or unexpected emergency which calls for immediate action." In this case, there was abundant evidence of such a sudden and unexpected emergency calling for immediate action. We therefore affirm the trial court in all respects.

*Ross*, 27 S.W.3d at 529-30.

In the present case, the jury returned a general verdict for all of the defendants. We do not know if the jury actually found that there was a sudden emergency and the defendants acted appropriately in light of that sudden emergency, or whether the jury found there was no sudden emergency and the defendants' actions were nevertheless within the recognized standard of professional practice. The point being, the issue on appeal is not whether there actually was or was not a sudden emergency, only whether there was sufficient proof in the record to support the Trial Court's decision to so charge the jury. All of the medical proof at trial was that shoulder dystocia is a somewhat rare but known occurrence, and shoulder dystocia not being resolved by the McRoberts maneuver and suprapubic pressure is considerably more rare. Even Plaintiffs' expert witness testified that, on average, shoulder dystocia occurs in 3% of all deliveries, and 90% of the time it is resolved by the initial maneuvers. Thus, based on Plaintiffs' proof, a typical physician will encounter shoulder dystocia that is not relieved by the initial maneuvers approximately 0.3% of the time. Dr. Lanning testified that in his 21 years as an obstetrician, he delivered roughly 4,000 babies, he encountered shoulder dystocia 100 times, and the present case was the first time that it was not resolved with the initial maneuvers.

We agree with Plaintiffs' argument that because of a physician's training and background, the sudden emergency doctrine has a limited application in medical malpractice cases. Simply because there is a medical complication does not necessarily mean that there is a sudden emergency. We are not, however, willing to go as far as argued by Plaintiffs and hold that the sudden emergency doctrine never is applicable in a medical emergency situation. Having said that, we conclude that there was sufficient proof presented at trial that the circumstance underlying the sudden emergency doctrine, i.e., the existence of a sudden or unexpected emergency, was present in this case when there was material evidence presented to the jury that the shoulder dystocia did not resolve after application of the McRoberts maneuver and suprapubic pressure, something not seen or experienced by Dr. Lanning in his twenty-one years as an obstetrician delivering roughly 4,000 babies. We, therefore, find no error in the Trial Court's decision that there was sufficient proof presented at trial to justify charging the jury on sudden emergency so as to allow the jury to find whether there was or was not a sudden emergency in its comparative fault analysis.

Plaintiffs' second issue on appeal is whether the Trial Court erred when it refused to allow Nurse Sturgill to be cross-examined by using certain medical literature as provided for by Tenn. R. Evid. 618. In *Robinson v. Baptist Memorial Hospital-Lauderdale*, No. W2006-01404-COA-R3-CV, 2007 WL 2318185 (Tenn. Ct. App. Aug. 15, 2007), *no appl. perm. appeal filed*, this Court noted that:

> [A] trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995). The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of

acceptable alternatives. *State ex rel. Vaughn v. Kaatrude*, 21 S .W.3d 244, 248 (Tenn. Ct. App. 2000). While we will set aside a discretionary decision if it does not rest on an adequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

*Robinson*, 2007 WL 2318185, at * 4.

Plaintiffs called Martha Eakes as an expert witness at trial.[3] During direct-examination, Nurse Eakes identified an article titled "Intrapartum Management Module" as being a reliable medical authority. When Plaintiffs later attempted to cross-examine Nurse Sturgill using this article to support Plaintiffs' position that the application of fundal pressure during the delivery of the Child was a violation of the acceptable standard of professional practice, the defendants objected for several reasons. First, the defendants claimed that the article had not been established as reliable authority that was used in Wilson County. Second, the defendants argued that Plaintiffs had not established that the article set forth the applicable standard of care during the relevant time frame. It appears the Trial Court ultimately agreed with the latter argument. When counsel for Plaintiffs stated: "So basically your ruling would be the additional foundation would have been necessary to link it to the year …", the Trial Court responded in the affirmative.

In their brief, Plaintiffs focus entirely on whether they needed to comply with the locality rule before the article could be considered reliable authority and used for impeachment purposes under Tenn. R. Evid. 618. Plaintiffs do not discuss the propriety of the Trial Court's ultimate ruling that they failed to lay a proper foundation because there was nothing linking the standard of care discussed in the article to the standard of care that was applicable when the Child was born. We, therefore, consider this issue waived.

However, even if this issue was not waived, we nevertheless would hold any such error, assuming there was any, to be harmless. The jury was presented with a great deal of conflicting testimony as to whether Nurse Sturgill did or did not apply fundal pressure. Plaintiffs' proof was that she did, and Defendants' proof was that she did not. The jury may have quite simply found that Nurse Sturgill did not apply fundal pressure.

As mentioned earlier, Defendants raise as a separate issue their position that the Trial Court erred in allowing Plaintiffs' experts to testify because their testimony neither satisfied the locality rule nor was scientifically reliable. In light of our decision as to the issues raised by Plaintiffs, Defendants' issue is pretermitted.

---

[3] The defendants objected to Nurse Eakes' qualifications as an expert. Accordingly, a voir dire examination was conducted outside the presence of the jury. Following the examination, the Trial Court determined that Nurse Eakes was qualified to testify as an expert witness.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are taxed to the Appellants, Katherine Deloriese Olinger and Perry Michael Hale, and their surety.

_____
D. MICHAEL SWINEY, JUDGE