NELLY LEATHERWOOD, INDIVIDUALLY, NELLY LEATHERWOOD AND JAMES DAVID
COOPER, GUARDIAN AD LITEMS FOR AMELIA JANENE COOPER, AND NELLY
LEATHERWOOD AND JAMES DAVID COOPER, INDIVIDUALLY, PLAINTIFFS V.
THOMAS M. EHLINGER, M.D., DEFENDANT

No. COA01-728

(Filed 18 June 2002)

**1. Medical Malpractice— standard of care—injury during
birth—directed verdict**

The trial court erred by granting a directed verdict for defend-
ant in a medical malpractice action arising from a birth on the
ground that plaintiffs had been unable to establish breach of the
applicable standard of care where plaintiffs' expert concluded
that defendant had not properly performed the procedures uti-
lized in resolving this emergency and that defendant had used
excessive traction. Although the expert was unable to articulate
precisely the amount of lateral traction he considered exces-
sive, the record shows that he visually demonstrated his testi-
mony with models and illustrated the amount of pressure to be
applied.

**2. Medical Malpractice— standard of care—obstetrics—famil-
iarity of expert**

Defendant was not entitled to a directed verdict in a medical
malpractice action on the ground that plaintiffs failed to establish
the applicable standard of care in Asheville where plaintiffs'
expert specifically testified that he had knowledge of the stand-
ards of practice among obstetricians with similar training and
experience in Asheville and similar communities; he had attended
rounds as a medical student in the hospital in which this delivery
occurred; he had practiced in communities similar in size to
Asheville; and he specifically testified that Asheville and other
communities of that size practice the same national standards
with respect to this condition.

**3. Medical Malpractice— injury during birth—proximate
cause—sufficiency of evidence**

The plaintiffs in a medical malpractice action arising from an
injury during birth presented sufficient evidence as to proximate
cause to overcome a motion for directed verdict where defendant
contended that the testimony of plaintiffs' expert was not sup-
ported by the relevant medical literature, but the record shows

that the expert reviewed the medical records and deposition testimony and based his opinion as to the cause of the injury on his training and extensive experience with these injuries. His testimony clearly demonstrates that his opinion was based on more than speculation and was sufficiently reliable to be submitted to the jury.

**4. Medical Malpractice— obstetrician—qualified as expert**

The trial court did not err in a medical malpractice action arising from a birth by denying defendant's motion to strike the testimony of plaintiffs' expert on the ground that plaintiffs' expert was not of the same or similar specialty as defendant and did not actively practice as an obstetrician in the year prior to the delivery in question. The record shows that both doctors belong to the American College of Obstetrics and Gynecology; the expert, a perinatologist, testified that all perinatologists are first obstetrician gynecologists; that perinatology, like obstetrics, includes the management of this injury; and that he continued to practice as an obstetrician gynecologist with the majority of his time in the year preceding this birth being devoted to the clinical practice of obstetrics and gynecology.

Appeal by plaintiffs from judgment entered 22 December 2000 by Judge James R. Vosburgh in Swain County Superior Court. Heard in the Court of Appeals 13 March 2002.

*Long, Parker, Warren & Jones, P.A., by Steve Warren, for plaintiffs-appellants.*

*Dean & Gibson, L.L.P., by Rodney A. Dean and John W. Ong, for defendant-appellee.*

WALKER, Judge.

Plaintiffs Nelly Leatherwood (Ms. Leatherwood) and James David Cooper (Mr. Cooper), individually and as guardian ad litems for Amelia Janene Cooper (Amelia), filed this action on 18 May 1998 alleging defendant was negligent in the medical care and treatment he provided during the delivery of Amelia. Defendant denied liability and a trial commenced on 27 November 2000. At the end of plaintiffs' evidence, defendant moved to strike the testimony of plaintiffs' medical expert, Dr. Stephen Jones (Dr. Jones), and for a directed verdict. The trial court denied both of these motions. At the close of all the evidence, defendant again moved to strike Dr. Jones' testimony and for

a directed verdict. The trial court denied the motion to strike but granted defendant a directed verdict on 22 December 2000.

The pertinent facts viewed in a light favorable to plaintiffs are summarized as follows: Defendant is a physician practicing as an obstetrician gynecologist at the Asheville Women's Medical Center (AWMC). In February 1992, Ms. Leatherwood became pregnant with Amelia and began prenatal treatment with AWMC under the care of Drs. Hill and Callahan. During this time, Ms. Leatherwood was diagnosed with gestational diabetes. Additionally, thirty-six weeks into pregnancy, her baby's fetal weight was estimated at eight and one-half pounds.

On the morning of 12 October 1992, Ms. Leatherwood experienced preliminary stages of labor and was admitted to a birthing room at Memorial Mission Hospital in Asheville. With her were her mother, Merceidith Bacon (Ms. Bacon), and Mr. Cooper. The nurse present, Janet McKendrick (Nurse McKendrick), took Ms. Leatherwood's vital signs and attached a fetal monitor across her stomach.

After her labor began to intensify, defendant entered the birthing room and informed Ms. Leatherwood that Dr. Hill was unavailable and that he would be delivering her baby. This was the first contact Ms. Leatherwood had with defendant. According to Ms. Leatherwood and Ms. Bacon, at no time did defendant make any effort to estimate the baby's fetal weight. Ms. Leatherwood then started to push but experienced difficulty with the delivery. To assist her, defendant instructed Ms. Bacon to insert mineral oil inside Ms. Leatherwood's vagina. When this failed to produce Amelia's head, defendant directed Ms. Bacon and Nurse McKendrick to stand on either side of Ms. Leatherwood "pulling [her] knees back against her chest." This maneuver also proved unsuccessful so defendant used a vacuum extractor to deliver Amelia's head.

Although Amelia's head had been produced, Ms. Leatherwood was unable at this point to deliver the rest of Ameila's body. Defendant determined that this was due to shoulder dystocia; a condition in which the baby's shoulder is impacted behind the mother's pubic bone thereby preventing delivery of the rest of the body. To correct the problem, defendant first applied "lateral traction" on Amelia's head attempting to roll her shoulder. According to Ms. Bacon's testimony, defendant pulled "the baby's head downward toward the floor in a left to right . . . motion . . . several times . . .

tugging very hard." He next pulled "the baby's head which [was] facing [Ms. Leatherwood's] left interior thigh . . . away from that thigh in a backwards motion, with the head going back towards the interior right thigh." Finally, as recounted by Ms. Bacon, defendant grasped Amelia's head "[bringing it] toward the pubic bone in a right to left motion . . . twisting it upward."

Despite these efforts, Ms. Leatherwood still was unable to deliver the rest of Amelia's body. Nurse McKendrick then straddled Ms. Leatherwood and placed her hands on the upper portion of Ms. Leatherwood's stomach. Defendant next made an incision in Ms. Leatherwood's vaginal opening. Thereafter, with each ensuing contraction Nurse McKendrick applied pressure to Ms. Leatherwood's pelvic area while defendant continued to manipulate the baby's head. Following two or three contractions, the rest of Amelia's body was delivered.

The hospital's medical records noted that Amelia weighed nine pounds, fifteen ounces and that she had limited function in her left arm. Subsequent medical examinations and exploratory surgery determined that she had a complete tear of the C8-T1 nerve root in her left brachial plexus—a nerve structure located in the neck and armpit. Amelia was diagnosed as having Erb's Palsy—a condition whereby she cannot elevate her left arm at her shoulder and is unable to externally rotate her left arm. She has difficulty performing routine tasks at home and school without assistance.

I.

Plaintiffs first contend the trial court erred in granting defendant's motion for a directed verdict. A motion for a directed verdict requires the trial court to determine whether the evidence, when considered in the light most favorable to the non-movant, was sufficient for submission to the jury. *Smith v. Wal-Mart Stores, Inc.*, 128 N.C. App. 282, 285, 495 S.E.2d 149, 151 (1998) (*quoting Kelly v. International Harvester Co.*, 278 N.C. 153, 157, 179 S.E.2d 396, 398 (1971)). "The grounds for the motion must be specifically stated . . . and an appellate court will not consider grounds other than those stated to the trial court in reviewing the trial court's ruling on the motion." *Stacy v. Jedco Const., Inc.*, 119 N.C. App. 115, 123, 457 S.E.2d 875, 881, *disc. rev. denied*, 341 N.C. 421, 461 S.E.2d 761 (1995) (*citing La Grenade v. Gordon*, 60 N.C. App. 650, 299 S.E.2d 809 (1983) and *Feibus & Co. v. Godley Construction Co.*, 301 N.C. 294, 271 S.E.2d 385 (1980)). All evidentiary conflicts are resolved in favor

of the non-movant. *See Merrick v. Peterson*, 143 N.C. App. 656, 661, 548 S.E.2d 171, 175, *disc. rev. denied*, 354 N.C. 364, 556 S.E.2d ·572 (2001).

In negligence cases, a directed verdict is seldom appropriate in view of the fact that the issue of whether a defendant breached the applicable standard of care is normally a factual question which the jury must answer. *See Barber v. Presbyterian Hosp.*, 147 N.C. App. 86, 88, 555 S.E.2d 303, 305 (2001). As our Supreme Court has aptly stated, "Where the question of granting a directed verdict is a close one, the better practice is for the trial judge to reserve his decision on the motion and allow the case to be submitted to the jury." *Manganello v. Permastone, Inc.*, 291 N.C. 666, 669-70, 231 S.E.2d 678, 680 (1977). Nevertheless, where there is an absence of evidence indicating that a defendant's failure to conform with the applicable standard of care proximately caused a plaintiff's injury, a directed verdict is proper. *See Weatherford v. Glassman*, 129 N.C. App. 618, 621, 500 S.E.2d 466, 468 (1998) (*citing Lowery v. Newton*, 52 N.C. App. 234, 237, 278 S.E.2d 566, 570, *disc. rev. denied*, 303 N.C. 711 (1981) (outlining the elements a plaintiff must show in a medical malpractice action)).

With these principles in mind, we turn to plaintiffs' contention that they presented sufficient evidence to withstand defendant's motion for a directed verdict. Although the trial court did not specify the grounds upon which it granted defendant's motion, our review of the record reveals defendant's argument centered on the following: (1) plaintiffs' failure to establish the applicable standard of care in Asheville or similar communities at the time of Amelia's injury and that defendant had breached said standard, and (2) the lack of a causal link between defendant's care and Amelia's injury.

A. Defendant's Breach of the Applicable Standard of Care

[1] The guidelines for establishing the applicable standard of care in a medical malpractice action are set forth in N.C. Gen. Stat. § 90-21.12, which provides in pertinent part:

The defendant shall not be liable for the payment of damages unless the trier of facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience

situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

N.C. Gen. Stat. § 90-21.12 (2001). Ordinarily, because the practice of medicine involves a specialized knowledge beyond that of the average person, the applicable standard of care must be established through expert testimony. *See Mazza v. Huffaker,* 61 N.C. App. 170, 175, 300 S.E.2d 833, 837, *disc. rev. denied,* 309 N.C. 192, 305 S.E.2d 734 (1983) (*quoting Jackson v. Sanitarium,* 234 N.C. 222, 226-27, 67 S.E.2d 57, 61 (1951)).

Here, plaintiffs sought to establish the applicable standard of care through the testimony of Dr. Jones, an obstetrician gynecologist with a subspecialty in perinatology and licensed to practice in South Carolina and Alabama. The record shows that Dr. Jones initially testified that a baby with a large fetal weight and whose mother has developed gestational diabetes, has a "20 to 50 percent risk" of being born "having shoulder dystocia." He then testified as to the procedures an obstetrician employs to identify a shoulder dystocia emergency. According to Dr. Jones, after a baby's head is produced and the rest of the body fails to follow, the obstetrician should apply "gentle traction down on the baby's head" to confirm that shoulder dystocia exists. To illustrate for the jury what he meant by "gentle traction," Dr. Jones used an anatomical model which depicted the anatomy of a pregnant female and a model baby. He placed one hand under the model baby's head and his other hand on top. He then applied pressure in a downward direction in reference to the female model's bottom and in a lateral direction in reference to the baby model's shoulders. Dr. Jones stated, "I can't tell you the exact pressure, but I can tell you from my training and the other people that are trained, we know when to stop and when you pull too hard."

Dr. Jones further testified that once shoulder dystocia is evident, the obstetrician employs a series of drills designed to resolve the problem including: the "McRobert's procedure" in which the mother's legs are pulled up to her chest thereby allowing a greater angle for the baby's shoulders to be delivered; "supra pubic pressure" which involves the application of pressure on the lower portion of the mother's stomach in an effort to push the baby's shoulder down and disengage the pubic bone; the "Wood screw maneuver" in which the obstetrician reaches into the mother's vagina and pushes upward on the baby's shoulder; a "posterior arm delivery" where the obstetrician again reaches inside the mother's vagina and applies pressure to the

baby's posterior arm in an effort to sweep it over the baby's head; and, as a last resort, the "Zavenelli Maneuver" in which the obstetrician pushes the baby's head back inside and proceeds with a cesarean delivery.

Based on his review of the medical records and the deposition testimony, Dr. Jones concluded that defendant failed to identify in Ms. Leatherwood the risk factors associated with shoulder dystocia and to properly utilize the procedures to be used in resolving a shoulder dystocia emergency. Specifically, he noted defendant did not take into account that Ms. Leatherwood had been diagnosed with gestational diabetes or that Amelia was likely to have a large fetal weight. Additionally, Dr. Jones stated the medical records and deposition testimony showed that the "McRobert's procedure" was applied before and not after Amelia's head had been produced and that pressure had been applied to the upper rather than lower portion of Ms. Leatherwood's stomach. Ultimately, Dr. Jones opined that defendant had applied excessive lateral traction during Amelia's birth, which caused a tear of the C8-T1 nerve root in her left brachial plexus and resulted in her Erb's Palsy condition.

Defendant initially argues that plaintiffs failed to meet their required burden of establishing that he had breached the applicable standard of care by reason that Dr. Jones could not articulate the precise amount of lateral traction an obstetrician in Asheville or a similar community would have used when faced with a shoulder dystocia emergency.[1] However, the record reveals that, after reviewing all of the medical records and deposition testimony, Dr. Jones concluded that defendant had not properly performed the procedures utilized in resolving a shoulder dystocia emergency. In his opinion, defendant had used excessive lateral traction beyond that which was the applicable standard of practice among obstetricians who practiced in Asheville and similar communities. Although Dr. Jones was unable to articulate precisely what amount of lateral traction he considered to be excessive, the record shows he visually demonstrated his testimony though the use of the anatomical models in which he illustrated for the jury the amount of pressure to be applied. When considered in

---

1. Defendant also argued that Dr. Jones was not qualified under Rule 702(b) to provide expert testimony concerning the applicable standard of care. However, the trial court's denial of defendant's motion to strike Dr. Jones' testimony makes it unlikely that it granted defendant a directed verdict on these grounds. We address defendant's cross-assignment of error related to this issue in Section II of the opinion.

LEATHERWOOD v. EHLINGER

[151 N.C. App. 15 (2002)]

the light most favorable to plaintiffs, we conclude Dr. Jones' testimony established an issue of fact to be resolved by the jury.

[2] Defendant also argues that plaintiffs failed to establish the applicable standard in that Dr. Jones was unfamiliar with the standard of care in Asheville or similar communities at the time of Amelia's injury. He maintains that, as a result, Dr. Jones' testimony related only to a national standard of care which is not permitted under N.C. Gen. Stat. § 90-21.12.

In support of this argument, defendant cites *Henry v. Southeastern OB-GYN Assoc., P.A.*, 145 N.C. App. 208, 550 S.E.2d 245, *aff'd*, 354 N.C. 570, 557 S.E.2d 530 (2001). Like the case before us, *Henry* involved a medical malpractice claim concerning the delivery of a baby involving a shoulder dystocia emergency. The plaintiffs offered the testimony of an expert obstetrician gynecologist with a practice in Spartanburg, South Carolina, against a defendant who practiced in Wilmington. However, at trial the plaintiffs' expert failed to testify that he was familiar with the standard of care in Wilmington or like communities and, in fact, stated in a pretrial deposition that he did not know anything about Wilmington. Nevertheless, the plaintiffs maintained that their expert was familiar with the standard of care in Spartanburg and that the standard was the same as that applied at Duke Hospital in Durham and UNC-Hospital in Chapel Hill. Therefore, they argued, the expert could testify as to the applicable standard of care in Wilmington. *Id.* at 208-09, 543 S.E.2d at 912. This Court disagreed and held the expert did not satisfy the requirements set forth in N.C. Gen. Stat. § 90-21.12. *Id.* at 213-14, 543 S.E.2d at 914.

We find the facts in *Henry* notably distinguishable from those in this case. In contrast with the expert in *Henry,* Dr. Jones specifically testified that he had "knowledge of the standards of practice among obstetricians with similar training and experience as that of [defendant] in Asheville and similar communities [at the time of Amelia's injury] with regard to the appropriate management of shoulder dystocia in delivering children." Additionally, he testified that, as a medical student, he attended rounds at the hospital in which Amelia was delivered. Further, the record shows that Dr. Jones practices in Greenville, South Carolina and has practiced in communities in Alabama and Mississippi, which are similar in size to Asheville. Finally, he specifically testified that "Asheville and other communities that size practice in the same national standards" with respect to the management of shoulder dystocia. *See Baynor v. Cook*, 125 N.C.

App. 274, 278, 480 S.E.2d 419, 421, *disc. rev. denied*, 346 N.C. 275, 487 S.E.2d 537 (1997) (noting that the "similar community" requirement of N.C. Gen. Stat. § 90-21.12 is not confined to North Carolina but would apply to adjoining and nearby communities "within or without our State"). As such, Dr. Jones made "the statutorily required connection to the community in which the alleged malpractice took place or to a similarly situated community" which this Court found was lacking in *Henry*. *See Henry*, 145 N.C. App. at 210, 543 S.E.2d at 913 (*quoting Tucker v. Meis*, 127 N.C. App. 197, 198, 487 S.E.2d 827, 829 (1997)); *see also Dickens v. Everhart*, 284 N.C. 95, 199 S.E.2d 440 (1973); *Haney v. Alexander*, 71 N.C. App. 731, 323 S.E.2d 430 (1984), *cert. denied*, 313 N.C. 329, 327 S.E.2d 889 (1985); *Howard v. Piver*, 53 N.C. App. 46, 279 S.E.2d 876 (1981).

We conclude plaintiffs provided sufficient evidence with respect to the applicable standard of care and defendant's breach of that standard to raise an issue of fact for the jury. Therefore, defendant was not entitled to a directed verdict on these grounds.

## B. Proximate Causation

**[3]** Additionally, defendant argues a directed verdict was proper in that plaintiffs failed to provide sufficient evidence showing a causal link between his care and Amelia's injury. Specifically, he maintains Dr. Jones' conclusion that excessive lateral traction can cause a tearing of the C8-T1 nerve root in the brachial plexus is not supported by the relevant "medical literature."

At its core, defendant's argument raises the question of whether Dr. Jones' causation opinion was sufficiently reliable to be presented to the jury. It is a well established principle that unless an expert's testimony on the issue of medical causation is sufficiently reliable, it is not considered competent evidence and therefore should not be presented to the jury. *See Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000). "[A]n expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility." *Id.* (citations omitted). Whether scientific opinion evidence is sufficiently reliable and relevant is a matter entrusted to the sound discretion of the trial court. *State v. Spencer*, 119 N.C. App. 662, 664, 459 S.E.2d 812, 814, *disc. rev. denied*, 341 N.C. 655, 462 S.E.2d 524 (1995) (citations omitted).

Implicit in the rules governing the admissibility of an expert's opinion is a precondition that the matters or data upon which the

LEATHERWOOD v. EHLINGER

[151 N.C. App. 15 (2002)]

expert bases his opinion be recognized as sufficiently reliable and relevant by the scientific community. *Id.* (*citing Daubert v. Merrell Dow*, 509 U.S. 579, 125 L. Ed. 2d 469 (1993); *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984) and N.C. Gen. Stat. § 8C-1, Rule 703 (1992)). Further, our Supreme Court has identified several indices of reliability including: "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith,' and independent research conducted by the expert." *State v. Pennington*, 327 N.C. 89, 98, 393 S.E.2d 847, 852-53 (1990); *see also State v. Berry*, 143 N.C. App. 187, 203-04, 546 S.E.2d 145, 157, *disc. rev. denied*, 353 N.C. 729, 551 S.E.2d 439 (2001).

Again, the record shows that Dr. Jones reviewed the medical records and deposition testimony. He based his opinion with respect to the cause of Amelia's injury on his training as an obstetrician gynecologist and his extensive experience with shoulder dystocia emergencies and brachial plexus injuries. He testified that birth simulated studies using manikin and cadaver models support his conclusion that, if during delivery an obstetrician applies a downward level of traction involving excessive pressure, an injury to the C8-T1 area of the baby's brachial plexus could result. This testimony clearly demonstrates his opinion that Amelia's injury was causally linked to defendant's care, was based on more than mere speculation, and was sufficiently reliable to be submitted to the jury.

Moreover, "[c]ausation is an inference of fact to be drawn from other facts and circumstances." *Turner v. Duke University*, 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989) (*citing Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 311 S.E.2d 559 (1984)). Accordingly, proximate cause is normally a question best answered by the jury. *Id.; see also Felts v. Liberty Emergency Service, P.A.*, 97 N.C. App. 381, 390, 388 S.E.2d 619, 624 (1990). Thus, we conclude plaintiffs presented sufficient evidence as to the proximate cause of Amelia's injury to overcome defendant's motion for a direct verdict.

For the reasons set forth above, we conclude that plaintiffs presented sufficient evidence to establish the applicable standard of care, a breach of the standard of care and proximate causation. Therefore, we hold the trial court improperly granted defendant's motion for a directed verdict. We reverse and remand the case for a new trial.

LEATHERWOOD v. EHLINGER

[151 N.C. App. 15 (2002)]

## II.

**[4]** In view of the likelihood that defendant will again seek to exclude Dr. Jones' testimony, we address defendant's contention that Dr. Jones is not properly qualified to give expert testimony. Rule 702(b) controls the admissibility of expert testimony on behalf of or against a medical "specialist." *See FormyDuval v. Bunn*, 138 N.C. App. 381, 383-84, 530 S.E.2d 96, 98-99, *disc. rev. denied*, 353 N.C. 262, 546 S.E.2d 93 (2000). To qualify as an expert, the witness must be a licensed health care provider in this or another state and meet the following two criteria:

(1) If the party against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:

a. Specialize in the same specialty as the party against whom or on whose behalf the testimony is offered; or

b. Specialize in a similar specialty which includes within its specialty the performance of the procedure that is the subject of the complaint and have prior experience treating similar patients.

(2) During the year immediately preceding the date of the occurrence that is the basis for the action, the expert witness must have devoted a majority of his or her professional time to either or both of the following:

a. The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, the active clinical practice of the same specialty or a similar specialty which includes within its specialty the performance of the procedure that is the subject of the complaint and have prior experience treating similar patients; or

b. The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

N.C. Gen. Stat. § 8C-1, Rule 702(b). Defendant maintains plaintiffs failed to qualify Dr. Jones pursuant to either of the criteria set forth

LEATHERWOOD v. EHLINGER

[151 N.C. App. 15 (2002)]

in Rule 702(b) in that Dr. Jones is not of the same or similar specialty as defendant and that he did not actively practice as an obstetrician in the year prior to Amelia's injury.

With respect to whether Dr. Jones is of the same or similar specialty as defendant, this Court recently addressed a similar issue in *Edwards v. Wall*, 142 N.C. App. 111, 542 S.E.2d 258 (2001). In *Edwards*, the plaintiffs sought to establish the applicable standard of care through the testimony of an expert certified as a pediatrician with a subspecialty in pediatric gastroenterology. However, the defendant was certified as a pediatrician. This Court held that the expert's certification as a pediatric gastroeneronologist, nevertheless, satisfied the criteria of Rule 702(b)(1). *Edwards*, 142 N.C. at 116, 542 S.E.2d at 263.

Defendant contends *Edwards* is distinguishable from this case arguing that, unlike the expert in *Edwards*, Dr. Jones' subspecialty training "heightened the standard of care" against which the jury was to judge defendant's performance. We disagree.

The record shows that both Dr. Jones and defendant belong to the American College of Obstetrics and Gynecology. Dr. Jones testified that "[a]ll perinatologists are first obstetrician gynecologists" and that perinatology, like obstetrics, includes "the performance in management of shoulder dystocia." He also testified that even though he is considered a perinatologist, he continues to practice as an obstetrician gynecologist. Thus, we conclude Dr. Jones is of the same or similar specialty as defendant such that he meets the criteria set forth in Rule 702(b)(1).

Additionally, Dr. Jones testified that, in the year preceding Amelia's birth, he devoted a majority of his time "to the clinical practice of obstetrics and gynecology" including "the performance of management of shoulder dystocia." Hence, we also conclude Dr. Jones satisfied the criteria set forth in Rule 702(b)(2). Therefore, the trial court did not err in denying defendant's motion to strike Dr. Jones' testimony.

### III.

Lastly, we note that plaintiffs have assigned as error the sequestration of Dr. Jones. The record shows that, upon defendant's motion, the trial court sequestered all witnesses called by the parties. Plaintiffs then requested that Dr. Jones be allowed to be present so that he might "hear the lay witness testimony from our clients" as

"not all the questions that need[ed] to be asked in their depositions were asked." Defendant objected citing his concern that Dr. Jones would be forming new opinions based on new testimony. The trial court then denied plaintiffs' request.

The sequestration of witnesses rest within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *See State v. Stanley*, 310 N.C. 353, 357, 312 S.E.2d 482, 485 (1984) and *Stanback v. Stanback*, 31 N.C. App. 174, 179, 229 S.E.2d 693, 696 (1976), *disc. rev. denied*, 291 N.C. 712, 232 S.E.2d 205 (1977). While the sequestering of witnesses in civil cases of this nature is ordinarily not raised as an issue, we note the record here is unclear as to why the trial court ordered the sequestering of all witnesses. However, we decline to address the issue as it is likely not to arise on remand.

In sum, the trial court did not err in denying defendant's motion to strike Dr. Jones' testimony. The trial court's granting of a directed verdict for defendant is reversed.

New trial.

Judge HUNTER and BRYANT concur.