NO. COA13-1428

NORTH CAROLINA COURT OF APPEALS

Filed: 1 July 2014

LAKISHA WIGGINS and G. ELVIN
SMALL, as Guardian *ad litem* for
ROY LEE BROTHERS, A Minor,
    Plaintiffs,

v.                                    Chowan County
                                      No. 08 CVS 186
EAST CAROLINA HEALTH-CHOWAN, INC.
d/b/a CHOWAN HOSPITAL and MICHAEL
DAVID GAVIGAN, M.D.,
    Defendants.


Appeal by plaintiffs from judgment entered 15 April 2013 by

Judge Gary E. Trawick in Chowan County Superior Court.  Heard in

the Court of Appeals 22 April 2014.


    *Charles G. Monnett III & Associates, by Charles G. Monnett*
    *III, for plaintiffs-appellants.*

    *Harris, Creech, Ward and Blackerby, P.A., by Charles E.*
    *Simpson, Jr. and Thomas E. Harris, for defendant-appellee.*


    HUNTER, Robert C., Judge.


    Lakisha  Wiggins  ("Ms.  Wiggins")  and  G.  Elvin  Small,

guardian  ad  litem  for  Ms.  Wiggins's  son,  Roy  Lee  Brothers,

("Roy")  (collectively  "plaintiffs")  appeal  from  judgment  entered

on  15  April  2013  in  favor  of  East  Carolina  Health-Chowan,  Inc.

d/b/a  Chowan  Hospital  ("Chowan  Hospital"  or  "defendant")  on

plaintiffs' medical negligence claim.[1] On appeal, plaintiffs argue that the trial court erred by: (1) instructing the jury on the sudden emergency doctrine; and (2) failing to instruct the jury on defendant's liability for unsuccessful or harmful subsequent medical treatment necessitated by defendant's negligence.

After careful review, we hold that the trial court erred by instructing the jury on the sudden emergency doctrine and remand for a new trial.

## BACKGROUND

The evidence presented at trial established the following facts: On Friday, 8 July 2005, Ms. Wiggins was admitted to Chowan Hospital for labor and delivery of her son, Roy. Labor was induced on Friday night but was discontinued until the following morning. Prior to Ms. Wiggins's arrival at Chowan Hospital, there was no indication that anything was wrong with Roy or that he had suffered any injury. After a brief pause the night before, induction resumed at 8:08 a.m. on 9 July 2005 with the administration of the drug Pitocin. Though required by hospital protocols, no vaginal exam was conducted at this time. At around 12:54 p.m., a nurse performed a vaginal exam on Ms. Wiggins and discovered an umbilical cord prolapse.

---

[1] Dr. Michael Gavigan ("Dr. Gavigan") was also named as a defendant in plaintiffs' complaint. He is no longer a defendant to this suit and is not a party in this appeal.

A cord prolapse is a condition where the umbilical cord protrudes from the vagina. The baby's blood supply and oxygen may become compromised if the cord is compressed. Low blood flow and low oxygen can cause damage to a baby's brain. Standards of practice require a baby to be delivered as soon and as safely as possible by emergency cesarean section ("C-section") in the event of a cord prolapse.

After discovering the cord prolapse, the nurses immediately called the attending physician, Dr. Gavigan, and preparations were made for an emergency C-section. It took sixteen minutes to move Ms. Wiggins into the operating room. Dr. Gavigan proceeded with the C-section under local anesthetic.

Roy was delivered at 1:30 p.m. with APGAR scores of 0 at one minute after birth, 3 at five minutes, and 7 at ten minutes. An APGAR score is a test designed to evaluate a newborn's physical condition using a score of 0-10 and to determine whether any immediate additional or emergency care is needed. Dr. Charles O. Harris, a practicing obstetrician, testified at trial that an APGAR score of 0 means the baby had no heart rate, no respiratory rate, and no muscle tone. He further testified that "[Roy's] ten minute APGAR was seven which is normal" and stated that Roy's initial resuscitation by the pediatric team "went well."

Following delivery, Roy was transferred to The Children's Hospital of the King's Daughters in Norfolk, Virginia ("The Children's Hospital") for further treatment. At the time, The Children's Hospital was a participant in clinical trials for an experimental cooling procedure that is used on newborns who suffer brain damage due to low oxygen or blood flow at birth. The cooling is meant to reduce the metabolic needs of a newborn's brain tissue to help prevent long-term damage. This procedure was performed on Roy when the transport team arrived. However, the procedure was discontinued after Roy experienced a second episode of low oxygen while being cooled.

Plaintiffs filed a complaint against Chowan Hospital and Dr. Gavigan on 27 June 2008 alleging that Roy sustained severe brain injury as a proximate result of defendants' failure to perform a C-section in a timely manner. According to the complaint, Roy has permanent cognitive impairments and loss of motor control due to the complications with his birth. At trial, plaintiffs presented testimony of liability expert Dr. Fred Duboe ("Dr. Duboe"), who testified that Chowan Hospital's nurses were negligent by failing to: (1) perform a vaginal exam immediately before administering Pitocin as required by the applicable standards of practice and the hospital's own protocols; (2) notify Dr. Gavigan of the results of the vaginal exam that should have been performed; (3) give Terbutaline to

slow or stop Ms. Wiggins's contractions after the cord prolapse occurred; and (4) move Ms. Wiggins to the operating room expediently before Roy's delivery by emergency C-section.

Several expert witnesses at trial testified that a cord prolapse is uncommon and qualifies as a medical emergency. All of the healthcare providers and experts who testified at trial agreed that Ms. Wiggins did not have any risk factors for a cord prolapse.

During the charge conference, defendants requested and the trial court agreed to give an instruction regarding the sudden emergency doctrine, which lessens the standard of care for a defendant in certain emergency situations; plaintiffs preserved their objections to the instruction. The jury returned a verdict in favor of defendants on 20 March 2013, and judgment was filed 15 April 2013. Plaintiffs timely filed and served notice of appeal.

## DISCUSSION

### I. Jury Instruction on the Sudden Emergency Doctrine

Plaintiffs argue that the trial court erred by instructing the jury on the sudden emergency doctrine because the doctrine is not applicable in medical negligence actions and was therefore misleading and likely affected the outcome of the trial. We agree.

The trial court is responsible for ensuring that the jury is properly instructed before deliberations begin. *Mosley & Mosley Builders, Inc. v. Landin Ltd.,* 87 N.C. App. 438, 445, 361 S.E.2d 608, 612 (1987) ("It [is] the duty of the [trial] court to instruct the jury upon the law with respect to every substantial feature of the case."). A trial court's primary purpose in instructing the jury is "the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *Littleton v. Willis*, 205 N.C. App. 224, 228, 695 S.E.2d 468, 471 (2010). In considering whether to give a requested jury instruction, the evidence must be viewed in the light most favorable to the party requesting the instruction. *Carrington v. Emory*, 179 N.C. App. 827, 829, 635 S.E.2d 532, 534 (2006). On appeal, this Court should consider the jury charge contextually and in its entirety. *Hammel v. USF Dugan, Inc.,* 178 N.C. App. 344, 347, 631 S.E.2d 174, 178 (2006).

> The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. The party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by an omitted instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the

jury.

*Id.* (citations and quotation marks omitted).

The North Carolina Pattern Jury Instruction for the standard of care in a medical negligence case is based on the duties enunciated in *Hunt v. Bradshaw*, 242 N.C. 517, 521, 88 S.E.2d 762, 765 (1955), and later codified into N.C. Gen. Stat. § 90-21.12 (2013).[2] It provides that a plaintiff needs to prove that the defendant was negligent in providing medical care by establishing a violation of any one of the following duties:

---

[2] We note that the General Assembly recently amended section 90.21-12 to address the precise issue raised in this appeal. Subsection (b) provides:

> (b) In any medical malpractice action arising out of the furnishing or the failure to furnish professional services in the treatment of an emergency medical condition, as the term "emergency medical condition" is defined in 42 U.S.C. § 1395dd(e)(1)(A), the claimant must prove a violation of the standards of practice set forth in subsection (a) of this section by clear and convincing evidence.

N.C. Gen. Stat. § 90-21.12(b). Thus, rather than lowering the applicable standard of care, as with the sudden emergency doctrine, the General Assembly elected to raise the burden of proof for medical negligence actions arising from treatment of emergency medical conditions. However, because this amendment altered rather than clarified the law, and the facts which form the basis of this cause of action occurred prior to the amended statute's effective date of 1 October 2011, we cannot apply this provision here. *See Ray v. N.C. Dep't. of Transp.*, 366 N.C. 1, 8-10, 727 S.E.2d 675, 681-82 (2012) ("In the event that the amendment is a substantive change in the law, the effective date will apply."); *see also* 2011 Sess. Laws 400 § 11 (noting that section 90-21.12(b) "become[s] effective October 1, 2011, and appl[ies] to causes of actions arising on or after that date").

(1) The duty to use their best judgment in the treatment and care of their patient;

(2) The duty to use reasonable care and diligence in the application of their knowledge and skill to their patient's care; and

(3) The duty to provide healthcare in accordance with the standards of practice among members of the same healthcare profession with similar training and experience situated in the same or similar communities at the time the healthcare is rendered.

N.C.P.I. —Civ. 809.00A (2013).

Here, in addition to giving the pattern instruction for the healthcare professional standard in N.C.P.I.-Civ. 809.00A, the trial court also used the following pattern jury instruction requested by defendants on the sudden emergency doctrine:

A person who, through no negligence of his own, is suddenly and unexpectedly confronted with imminent danger to himself and others, whether actual or apparent, is not required to use the same judgment that would be required if there were more time to make a decision. The person's duty is to use that degree of care which a reasonable and prudent person would use under the same or similar circumstances. If, in a moment of such emergency, a person makes a decision that a reasonable and prudent person would make under the same or similar conditions, he does all that the law requires, even if in hindsight some different decision would have been better or safer.

N.C.P.I.—Civ. 102.15 (2013).

The applicability of the sudden emergency doctrine in medical negligence actions is an issue of first impression in North Carolina. Plaintiffs argue that the sudden emergency doctrine does not apply in medical negligence actions because medical emergencies are already contemplated and built-in to the standard of care for medical professionals; thus, plaintiffs argue that the trial court's charge to consider a what a "reasonable and prudent person" would do in a medical emergency was misleading to the jury, where they were also instructed to consider defendant's actions "in accordance with the standards of practice among members of the same healthcare profession." Defendant argues that the sudden emergency doctrine is equally applicable in medical negligence cases as it is in ordinary negligence cases. Defendant further contends that the instruction regarding the sudden emergency doctrine was not misleading when considered contextually in light of the entire jury charge.

In a general negligence action in North Carolina, the sudden emergency instruction can be requested when a party presents substantial evidence showing that a party (1) perceived an emergency situation and reacted to it, and (2) the emergency was not created by that party's own negligence. *Carrington*, 179 N.C. App. at 829-30, 635 S.E.2d at 534. "The doctrine of sudden emergency creates a less stringent standard of care for one who,

through no fault of his own, is suddenly and unexpectedly confronted with imminent danger to himself or others." *Marshall v. Williams*, 153 N.C. App. 128, 131, 574 S.E.2d 1, 3 (2002) (citation and quotation marks omitted).

> The state of the law on the doctrine of sudden emergency has been thoroughly stated by our courts. One who is required to act in an emergency is not held by the law to the wisest choice of conduct, but only to such choice as a person of ordinary care and prudence, similarly situated would have been.

*Masciulli v. Tucker,* 82 N.C. App. 200, 205-06, 346 S.E.2d 305, 308 (1986) (citation and quotation marks omitted).

Because our Courts have yet to address whether this doctrine applies to medical negligence cases, defendant relies on cases from Tennessee, New Mexico, and Massachusetts in which the appellate courts in those jurisdictions have affirmed application of the sudden emergency doctrine in the medical negligence context. In *Olinger v. Univ. Med. Ctr.*, 269 S.W.3d 560 (Tenn. Ct. App. 2008), the Tennessee Court of Appeals affirmed the trial court's jury instruction on the sudden emergency doctrine in a case involving labor and delivery that left the newborn baby with brachial plexus palsy. *Olinger,* 269 S.W.3d at 561. The doctor attempted two different maneuvers to resolve the shoulder dystrocia and it was found that the failure of those maneuvers was extremely rare. *Id.* at 565. Experts

testified at trial that the failure of a doctor to resolve shoulder dystrocia with two typical maneuvers should be considered a medical emergency. *Id.* at 566. The court stated:

> We agree with [p]laintiffs' argument that because of a physician's training and background, the sudden emergency doctrine has a limited application in medical malpractice cases. Simply because there is a medical complication does not necessarily mean that there is a sudden emergency. We are not, however, willing to go as far as argued by [p]laintiffs and hold that the sudden emergency doctrine never is applicable in a medical emergency situation.

*Id.* at 568-69.

In another case, the Tennessee Court of Appeals found material evidence of a sudden emergency when an individual with a minor cut on her finger subsequently experienced a vasovagal reaction after an emergency room doctor administered a numbing shot, and she subsequently fell off the gurney bed and developed a traumatic brain injury as a result of her fall. *See Ross v. Vanderbilt Uni. Med. Ctr.,* 27 S.W.3d 523, 525-26 (Tenn. Ct. App. 2000). The plaintiffs argued that the doctor was negligent because he left the bedside without putting up the bedrails, *id.* at 526, and "that the sudden emergency doctrine is not applicable in a medical malpractice case to lower the standard of acceptable professional practice required of an emergency room physician." *Ross,* 27 S.W.3d at 526, 529. The appellate court disagreed and held that "under the appropriate facts," the

sudden emergency doctrine may be applied in assessing an emergency room doctor's fault. *Id.* at 530. In so holding, the court emphasized the importance of the sudden emergency doctrine in a comparative fault jurisdiction, while noting there may also be instances where the doctrine may come into play when no comparative fault is alleged. *Id.* at 527-28. The court also noted that the doctrine does not constitute a defense "as a matter of law," and does not negate the defendant's liability, but must be considered as a factor in the comparative fault analysis. *Id.*

Defendant also cites *Sutherlin v. Fenenga,* 810 P.2d 353, 356 (N.M. Ct. App. 1991), where a 16-year-old boy who came into the emergency room with a sports injury to his knee died after an anesthesia machine malfunctioned during surgery, causing a rupture to his right lung. The New Mexico Court of Appeals held the defendant was entitled to an instruction on sudden medical emergency, which would have lowered the healthcare professionals' standard of care. *Sutherlin,* 810 P.2d at 360.

Finally, defendant cites *Linhares v. Hall*, 257 N.E.2d 429 (Mass. 1970), a case involving a medical negligence suit against an anesthesiologist after a minor plaintiff suffered a cardiac arrest during a routine tonsillectomy. The plaintiffs argued that cardiac arrest is always a possible complication during surgery and it should not be assumed to be "an emergency within

the meaning of the emergency doctrine." *Linhares*, 257 N.E.2d at 430. The appellate court disagreed and held "if an emergency did exist, a fact left to the determination of the jury, the defendant then and in that event was held to the exercise of a certain standard of care." *Id*.

Based on these cases, defendant argues that the sudden emergency doctrine is equally applicable to healthcare providers in North Carolina as it is to a layperson, and thus the trial court's instruction on the sudden emergency doctrine here was without error. For the following reasons, we disagree.

In North Carolina, the sudden emergency doctrine has been applied only to ordinary negligence claims, mostly those arising out of motor vehicle collisions, and has never been utilized in a medical negligence case. *See, e.g., McDevitt v. Stacy*, 148 N.C. App. 448, 458, 559 S.E.2d 201, 209 (2002); *Ligon v. Matthew Allen Strickland*, 176 N.C. App. 132, 141, 625 S.E.2d 824, 831 (2006); *Long v. Harris,* 137 N.C. App 461, 467, 528 S.E.2d 633, 637 (2000). Even in cases where the facts giving rise to suit could presumably be categorized as sudden medical emergencies, the general standard of care for healthcare professionals has been sufficient to assess liability. *See O'Mara v. Wake Forest Univ. Health Services*, 184 N.C. App 428, 434, 646 S.E.2d 400, 404 (2007) (utilizing the healthcare professional standard where the plaintiff alleged that a child's spastic quadriparetic

cerebral palsy was caused by oxygen deprivation during the final thirty minutes of birth); *Lentz v. Thompson*, 269 N.C. 188, 192, 152 S.E.2d 107, 110 (1967) (applying the standard of "professional knowledge and skill ordinarily had by those who practice that branch of the medical art or science" where the plaintiff's spinal accessory nerve was severed during surgery).

The application of the healthcare professional standard of care to a wide range of factual scenarios is not accidental. Our Supreme Court has described the standard for medical professionals as "*completely unitary in nature*, combining in one test the exercise of 'best judgment,' 'reasonable care and diligence' and compliance with the 'standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities.'" *Wall v. Stout*, 310 N.C. 184, 193, 311 S.E.2d 571, 577 (1984) (emphasis added) (holding that the passage of section 90-21.12 did not abrogate the duties of healthcare professionals created at common law). Part of the standard developed at common law is to examine a healthcare professional's conduct in light of the factual circumstances of the case. In *Brawley v. Heymann*, a semiconscious patient fell off of a narrow examining table to which he was not secured. *Brawley v. Heymann*, 16 N.C. App 125, 128, 191 S.E.2d 366, 367-368 (1972). This Court held that "[a] jury could reasonably conclude from such findings that defendant

failed to give, or see that plaintiff was given, such care as a reasonably prudent *physician in the same or similar circumstances would have provided*[.]" *Id.* (emphasis added).

Thus, the standard of care for healthcare professionals, both at common law and as enunciated in section 90-21.12, is designed to accommodate the factual exigencies of any given case, including those that may be characterized as medical emergencies. Therefore, we hold that the sudden emergency doctrine is unnecessary and inapplicable in such cases, and the trial court's instruction on the sudden emergency doctrine here was "likely, in light of the entire charge, to mislead the jury." *Hammel*, 178 N.C. App. at 347, 631 S.E.2d at 177. Because this erroneous instruction likely misled the jury, we remand for a new trial.

Even if we were to hold that that the sudden emergency doctrine is applicable in medical negligence cases, the trial court's specific instructions here would still require a new trial. The trial court instructed the jury that it should assess defendant's actions in light of what a reasonable and prudent *person* would do when faced with the same emergency. However, even in cases from other jurisdictions where the sudden emergency doctrine was applied in medical negligence actions, the language used by those trial courts limited the standard to a reasonable healthcare professional, not a reasonable person.

For example, the sudden emergency instruction as given in *Olinger* was as follows:

> A *physician/nurse* who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy or judgment as a person acting under normal circumstances who has time to think and reflect before acting. *A physician/nurse faced with a sudden emergency is required to act within the recognized standard of care applicable to that physician or nurse.* A sudden emergency will not excuse the actions of a person whose own negligence created the emergency.

*Olinger,* 269 S.W.3d at 564 (emphasis added). The sudden emergency instruction given in *Ross* reads:

> A *physician* who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy *of judgment as a physician* acting under normal circumstances . . . .

*Ross*, 27 S.W.3d at 526-27 (emphasis added). Finally, the instruction that the defendant requested in *Sutherlin*, UJI Civ. 13-1113, was specifically designed for use in medical cases. *Sutherlin*, 810 P.2d at 360. UJI Civ. 13-1113 provided that:

> A *doctor* who, without negligence on his part, is suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger *to the patient*, is not expected nor required to use the same judgment and prudence that is required *of the doctor in the exercise of ordinary care* in calmer and more deliberate moments.

*Id.* (emphasis added).

Thus, when compared to the instructions in the cases cited favorably by defendant, the trial court's specific language here was far too general to be considered a sound application of the law. The charge instructs the jury to simultaneously apply the "standards of practice among *members of the same healthcare profession* with similar training and experience situated in the same or similar communities at the time the health care is rendered" in addition to the duty to "use that degree of care which *a reasonable and prudent person* would use under the same or similar circumstances." These duties are incompatible. Healthcare professionals are held to a higher standard of care than laypersons. *See Leatherwood v. Ehlinger*, 151 N.C. App. 15, 20, 564 S.E.2d 883, 886 (2002) ("[B]ecause the practice of medicine involves a specialized knowledge beyond that of the average person, the applicable standard of care in a medical malpractice action must be established through expert testimony"), *disc. review denied*, 357 N.C. 164, 580 S.E.2d 368 (2003); *see also* N.C. Gen. Stat. 90-21.12(a) (emphasizing that medical professionals, to avoid liability, must uphold a level of care in accordance with "the standards of practice among members of the same health care profession with similar training and experience").

**CONCLUSION**

After careful review, we hold that the trial court erred by instructing the jury on the sudden emergency doctrine.  Because this error likely misled the jury, we reverse the underlying judgment and remand for a new trial.

NEW TRIAL.

Judges BRYANT and STEELMAN concur.