IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2007 Session

## BESSIE L. WHITE, ET AL. v. PREMIER MEDICAL GROUP, ET AL.

Appeal from the Circuit Court for Montgomery County
No. 50300019    Ross H. Hicks, Judge

No. M2006-01196-COA-R3-CV - Filed November 28, 2007

In this medical malpractice action against a treating physician, his medical group, and several hospital entities, the plaintiffs contend the trial court erred by including in the jury instructions the defense of superseding cause requested by the treating physician and his medical group. The plaintiffs argue the evidence was insufficient to justify the instruction. It is proper to charge the law upon an issue of fact within the scope of the pleadings upon which there is material evidence sufficient to sustain a verdict. The record contains material evidence regarding each of the essential elements of the defense of superseding cause sufficient to sustain a verdict of superseding cause; therefore, an instruction as to superseding cause was appropriate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. WILLIAM B. CAIN, J., not participating.

Steven R. Walker, Memphis, Tennessee; Randall Kinnard, Mark S. Beveridge, Lisa W. Rowan, Nashville, Tennessee, for the appellants, Bessie L. White, Linda R. Locke, Debra A. Anderson and Thomas W. Jones.

Steven Edward Anderson, Nashville, Tennessee, for the appellees, Premier Medical Group and Scott William McLain, M.D.

### OPINION

Ms. Wastille Jones was admitted to Gateway Medical Center on January 17, 2002, suffering from bilateral flank pain, as well as elevated blood urea nitrogen (BUN) and creatinine levels. Dr. Scott William McLain was her admitting physician. Initially, Ms. Jones was given a Demerol patient-controlled analgesia (PCA) pump for back pain, and numerous diagnostic tests were performed. Within a few days, Ms. Jones' BUN and creatinine levels had returned to baseline, but her back pain continued. On the fifth day, January 22, 2002, Dr. McLain discontinued the Demerol PCA pump and ordered 7.5 mg of Lortab together with 25 mg of Demerol on an as needed basis for breakthrough pain. On January 24, 2002, Dr. McLain increased the Lortab dosage to 10 mg. On the following day, Dr. McLain ordered a narcotic transdermal patch known as Duragesic at a dosage

of 50 mcg/hour.  Three days later, on January 28, 2002, the Duragesic patch was increased to 100 mcg/hour and Flexiril 10 mg, a muscle relaxant, was additionally ordered to be given every eight hours around the clock.

Dr. McLain had planned to discharge Ms. Jones to a rehabilitation facility on January 30, 2002; however, she was not discharged because on that day she was noted to be unstable when ambulating and having difficulty getting out of bed without assistance.  Dr. McLain felt that Ms. Jones was getting too much pain medication and discontinued the Lortab.  During his early morning rounds on January 31, 2002, Dr. McLain found Ms. Jones lethargic but arousable and in about the same condition as the previous day.  By 9:00 a.m., her occupational therapist noted that Ms. Jones was so unarousable that she could not participate in therapy.

Ms. Jones' condition continued to deteriorate during the day; however, Dr. McLain was not notified about her condition until being paged shortly before 7:30 p.m.  Finding her unresponsive and in respiratory distress when he arrived, Dr. McLain ordered Narcan, a medication designed solely to reverse the effects of narcotics. After the third dose of Narcan, Ms. Jones awakened and was able to speak with Dr. McLain.  Because her oxygen level was low and her carbon dioxide level high, Dr. McLain intubated Ms. Jones and immediately transferred her to the intensive care unit (ICU) of the hospital.  This transfer took place prior to 8:00 p.m. on January 31, 2002.  Dr. Jatin Kadakia, a pulmonary and critical care specialist, was the physician responsible for patients in the ICU at the time of Ms. Jones' transfer to the ICU.

Within the first hour, the pressure reading on Ms. Jones' ventilator was above the acceptable level, and the levels continued to increase throughout the evening.  By 12:30 a.m., the alarms on the ventilator sounded, indicating a blockage in the endotracheal tube that was impeding the flow of oxygen to Ms. Jones.  The alarm repeatedly sounded over the next few hours and at 1:40 a.m., Ms. Jones went into cardiopulmonary arrest.

Dr. Kadakia was not advised of any of these developments until after Ms. Jones went into cardiopulmonary arrest.  Dr. Kadakia was first called at approximately 2:25 a.m. and arrived at the ICU at 3:15 a.m., at which time he performed a bronchoscopy which disclosed a significant mucous "plug" that was obstructing the endotracheal tube.  Removal of the mucous "plug" cleared the endotracheal obstruction, immediately following which the pressure on Ms. Jones' ventilator dropped to an acceptable level.

Ms. Jones died the following day, February 2, 2002, after life support was withdrawn.

This wrongful death action was filed in January of 2003 by the surviving children of Ms. Jones.  The defendants included Gateway Health System, Inc., Gateway Health System, Inc. d/b/a Gateway Medical Center, Gateway Medical Center, Premier Medical Group, P.C., and Scott William McLain, M.D.  The two defendants involved in this appeal, Dr. McLain and his medical group, Premier Medical, answered the Complaint on February 13, 2003.  They denied the allegations of negligence and all allegations of an agency relationship with Gateway Medical Center. They additionally invoked the doctrine of comparative fault, contending the hospital and others were at fault.  Prior to trial, Plaintiffs settled with the hospital, Gateway Health System, Inc., and its

affiliated entities, leaving only Dr. McLain and his medical group, Premier Medical, as the defendants.

The case against Premier Medical and Dr. McLain was tried before a jury over five days in November of 2005. At the close of the proof, and following a jury charge conference, the trial judge instructed the jury and provided an explanation of the verdict form to be used. The trial transcript reveals what the judge told the jury:

Now, the verdict form is, again, designed to help you go about your decision in a logical rational way. And you need to follow it. It reads, "We the jury present the following answers to questions submitted by the court.

"Question number 1: Do you find Premier Medical Group, P.C., and Scott William McLain, M.D., at fault?"

Remember you need to consider Dr. McLain and Premier as one entity. So focus on Dr. McLain's conduct, and if your answer to that question is yes, then you would so indicate/ if no, you so indicate. The plaintiffs bear the burden of proving that Premier and Dr. McLain are at fault. And that's called to your attention. So you'll answer that first question.

Then it says, "If you answer no, do not go any further. Please sign this form and return to the courtroom. If you answered yes, then you need to proceed on to questions 2, 3, and 4."

Question 2, "Do you find Gateway Medical Center at fault?" And on that issue the defendants, Dr. McLain and Premier, bear the burden of proof. You answer that question yes or no.

Question 3. "What percentage of fault, if any, do you assign to each of the following parties: Premier Medical Group, Dr. McLain." There's a line out from them. "Gateway Medical Center." There's a line out from them.

On those lines, you are to assess or allocate fault between those parties if you reach this issue. And you would write on this line for Dr. McLain and Premier a percentage of fault somewhere between 0 and 100 percent, as you determine. You would write on the line for Gateway Medical Center a percentage of fault somewhere between 0 and 100 percent as you determine. The two numbers that you have written must total 100 percent.

Number 4, "What amount of damages, if any, were sustained?" Do not reduce those damages by any percentage of fault you may have assigned to Gateway Medical Center. It is the responsibility of the judge after you return your verdict to reduce the damages you award to the plaintiffs, if any, by any percentage of fault that you may assign to Gateway Medical Center.

And the four sub questions under number 4 -- or sub issues -- are any damages for Ms. Jones' mental and physical suffering between the injury and her death. There's a blank line with a dollar sign in front of it. On that line you put the amount of damages, if any, you assign for that particular element.

Item B, element B, is Ms. Jones' funeral expenses. You're given a blank line with a dollar sign. Put on that line any damages you award for funeral expenses that

the plaintiffs have proven, and you determined are the result of the parties and then you assign fault.

C, "earning capacity of the deceased by probable living expenses." Again, a line for you to put your -- any award of damages for that item.

And item D is "loss of consortium for the surviving children of Ms. Jones." Put the amount of damages that you award for that, if any, on that line.

You're to total those amounts, and that would be your damage award, total damages. Your presiding juror is then to sign the form and date it. And today I think is the 3rd of November.

The jury then retired to deliberate. After completing its deliberations, the jury returned to the court room to announce its verdict. In response to the first jury question, "Do you find Premier Medical Center, P.C., and Scott William [McLain], M.D. at fault?," the foreperson stated that the jury's unanimous answer was "No." The answer to the first question rendered the remaining questions moot. A judgment was subsequently entered in favor of Dr. McLain and Premier Medical Group.[1]

The issues presented by Plaintiffs for our review are: (1) whether the trial court erred by including the superseding cause instruction; and (2) whether the trial court erred by excluding evidence related to Dr. McLain's failure of the examination for board certification in his specialty, and in excluding evidence related to his lack of truthfulness.

## ANALYSIS

### A.
### REQUISITE PROOF TO SUPPORT A JURY INSTRUCTION

Plaintiffs contend the evidence was insufficient to justify an instruction on the issue of superseding cause.[2] We have determined it was sufficient.

It is proper for a court to charge the law upon an issue of fact within the scope of the pleadings upon which there is evidence, which even though slight, is "sufficient to sustain a verdict." *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Norman v. Fisher Marine, Inc.*, 672 S.W.2d 414, 421 (Tenn. Ct. App. 1984); *Ringer v. Godfrey*, 362 S.W.2d 825, 827 (Tenn. Ct. App. 1962); *Monday v. Millsaps*, 264 S.W.2d 6 (Tenn. Ct. App. 1953); *Hurt v. Coyne Cylinder*

---

[1] Thereafter, Plaintiffs filed a Tenn. R. Civ. P. 59 motion seeking a new trial on three grounds: (1) the trial court erred in charging the jury on superseding cause; (2) the court erred in disallowing evidence of Dr. McLain's repeated attempts and failure to pass the examination for board certification in the specialty of internal medicine; and (3) the verdict was contrary to the weight of the evidence. Plaintiffs also requested the trial court set aside the verdict as the thirteenth juror. The trial court overruled the Motion in its entirety and approved the verdict of the jury as thirteenth juror.

[2] No complaint is made as to the language stated in the charge as to superseding cause, which is verbatim from Tennessee Pattern Jury Instruction (Civil) § 3.22 (5th ed., 2005).

*Co.*, 956 F.2d 1319, 1326 (6th Cir.1992). For the evidence to be "sufficient to sustain a verdict," there must be evidence which is "material" to the issue.[3] *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997); *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978); *City of Chattanooga v. Rogers*, 299 S.W.2d 660 (Tenn. 1956); *D.M. Rose & Co. v. Snyder*, 206 S.W.2d 897 (Tenn. 1947).

The Tennessee Supreme Court has described "material evidence" as "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321 (Tenn. 1905); *Fuller v. Tennessee-Carolina Transp. Co.*, 471 S.W.2d 953, 956 (Tenn. Ct. App. 1970). Black's Law Dictionary defines "material evidence" as "evidence having some logical connection with the consequential facts or the issues." Black's Law Dictionary 459 (7th ed. 2000); *see Smith v. Tennessee Furniture Indus., Inc.*, 369 S.W.2d 721, 728 (Tenn. 1963). This Court has described "material evidence" to be "such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Sexton v. Anderson County*, 587 S.W.2d 663, 666 (Tenn. Ct. App. 1979); *Mullins v. City of Knoxville*, 665 S.W.2d 393, 396 (Tenn. Ct. App. 1983) (noting that "beliefs, opinions, and fears of neighborhood residents do not constitute material evidence").

When determining whether there is material evidence sufficient to sustain a verdict, the appellate courts "do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict." *Reynolds*, 887 S.W.2d at 823. Instead, the appellate courts "are limited to determining whether there is material evidence to support the jury's verdict." *Id.* If we determine the record contains material evidence supporting the verdict, we are not to disturb the verdict. *Id.*

Accordingly, without judging the credibility of witnesses or weighing the evidence, we must determine whether there is any material evidence sufficient to sustain the defense of superseding cause. To make this determination, we must identify the superseding cause contended by Defendants and determine whether there is any material evidence in the record that pertains to each element of this defense.

### B.
### THE SUPERSEDING CAUSE CONTENDED BY DEFENDANTS

---

[3]The term "material evidence" should not be confused with "substantial evidence" or "substantial and material evidence." Substantial evidence has been defined as such evidence as reasonable minds might accept as adequate to support a conclusion. *Rice Bottling Co. v. Humphries*, 372 S.W.2d 170, 172 (Tenn. 1963). The term "substantial and material evidence" is most often used in appeals from decisions by administrative agencies, wherein the appellate court is often called upon to determine whether there is "substantial and material evidence" in the record to support the agency's decision. *See Lien v. Metro. Gov't. of Nashville,* 117 S.W.3d 753, 755 (Tenn. Ct. App. 2003) (citing *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999)). "Substantial and material" evidence as provided for in Tenn. Code Ann. § 4-5-322(h) is not defined but it is generally understood that "it required something less than a preponderance of the evidence, (citations omitted) but more than a scintilla or glimmer." *Lien,* 117 S.W.3d at 755 (quoting *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (1988)).

The essential elements of the defense of superseding cause are as follows: (1) the harmful effects of the superseding cause must have occurred after the original negligence; (2) the superseding cause must not have been brought about by the original negligence; (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence; and (4) the superseding cause must not have been reasonably foreseen by the original negligent party. *Godbee v. Dimick*, 213 S.W.3d 865, 882 (Tenn. Ct. App. 2006). We will, therefore, examine the record to determine whether there is material evidence concerning elements of the superseding cause contended by Defendants.

It is contended by Plaintiffs that the injuries to Ms. Jones, her cardiovascular collapse and death, were caused by Dr. McLain's negligent care of Ms. Jones, specifically the negligent administration of an overdose of Duragesic. Defendants, however, contend her injuries and death resulted from the subsequent negligent acts and omissions of the nurses and respiratory therapists in the ICU who, along with Dr. Kadakia, the pulmonary and critical care physician, had the primary responsibility for the care of Ms. Jones. Specifically, Defendants contend the ICU nurses and respiratory therapists failed to properly monitor the ever increasing pressures on the ventilator, representing the inability of Ms. Jones to receive minimally acceptable levels of oxygen, and their corresponding failure to notify Dr. Kadakia of these facts during this critical time frame. It is during this critical time frame, Defendants contend, the ventilator pressures increased to the point that the ventilator alarm sounded repeatedly for hours, indicating an ever decreasing supply of oxygen; yet, the nurses and respiratory therapists did not clear the blockage or notify Dr. Kadakia of these facts until the opportunity to remedy the situation had passed. In summary, Defendants contend Ms. Jones' brain damage was due to oxygen deprivation that was caused by the mucous blockage of the endotracheal tube that occurred hours after Dr. McLain's alleged negligence, that the mucous blockage was not the result of Dr. McLain's negligence, and that Ms. Jones would not have died or been injured but for the failure of ICU personnel to remove the mucous blockage in a timely manner.

What occurred immediately prior to the transfer of Ms. Jones to the ICU and what occurred over the next several hours are both very relevant to the issue. Therefore, we will examine the relevant evidence as to each time frame.

After being intubated and placed on a ventilator by Dr. McLain and the anesthesiologist due to respiratory problems resulting from the sedatives, Ms. Jones was immediately transferred to the ICU. This occurred prior to 8:00 p.m. Dr. McLain testified that following the administration of Narcan to counteract the effect of the sedatives, Ms. Jones was responsive and conversing with him regarding her condition, although she was "short of breath," as Ms. Jones described it.

Dr. Robert Nichols, a medical expert witness for the defense, explained Ms. Jones' condition immediately after Dr. McLain gave her an injection of Narcan, started an IV, and administered two more injections of Narcan into the IV:

> At that point she awoke. She – from the notes, it appears that she told Dr. McLain, you know, I'm feeling short of breath, which somebody in this situation

when they wake up and their blood gases look the way hers did, they're going to feel short of breath.

So, you know, she's alert enough to realize, you know, that she's short of breath. Dr. McLain is somebody who can do something about that. She tells him that.

Later on, when she's in the intensive care unit, even I believe after she had gotten some Ativan, she's still opening and closing her eyes to questions, squeezing with both hands. And this – this is very rudimentary, but it's a pretty good sense that everything was connecting upstairs.

Dr. Nichols additionally testified that he did not believe Ms. Jones had suffered an irreversible brain injury, or any kind of permanent injury, as of the time she was transferred to the ICU. He was asked by counsel, "Doctor, you mentioned before you have an opinion as to whether Ms. Jones had suffered an irreversible brain injury or any kind of permanent type of injury as of the time she was sent to the intensive care unit." His answer to the question was, "No, I don't believe that she did." Dr. Nichols explained that his opinion was based in part on a 10:00 p.m. notation that appeared in the ICU critical care flow sheet which reads "Patient coming around, patient responds to verbal stimuli. She blinks as to simple yes and no questions, . . ." As Dr. Nichols further explained, that notation "tells you a lot, that she's able to comprehend and – and function enough to close her eyes appropriately."

The care Ms. Jones received or did not receive after being transferred to the ICU, and whether it violated the applicable standards of care, is explored and explained by three medical professionals: Dr. Gary Salzman, chairman of the intensive care unit at his hospital; Dr. Kadakia, the pulmonary and critical care specialist responsible for Ms. Jones' care while she was in the ICU; and Laurie Beth Moore, a licensed respiratory therapist working for Gateway when Ms. Jones was transferred to the ICU.

Dr. Salzman testified that once Ms. Jones was transferred to the ICU and Dr. McLain had provided orders with respect to ventilator management, the primary responsibility shifted from Dr. McLain to the critical care physician in the ICU, who in this case was Dr. Kadakia, and the nurses and respiratory therapists in the ICU. As Dr. Salzman explained, "nurses in an intensive care unit typically look to the intensive care doctor as their liaison, their line of authority, when it comes to questions of ventilator management." Thus, the ICU nurses and respiratory therapists were looking to Dr. Kadakia, not Dr. McLain, with respect to ongoing ventilator management. We also learn from Dr. Salzman's testimony that:

- A ventilator has a number of monitors equipped with alarms, including the peak inspiratory pressure alarm, which measures the amount of pressure that the machine has to generate to deliver air/oxygen to the patient.
- When the peak pressure is elevated, something is blocking the air flow to the patient.
- The higher the pressure, the worse it is for the patient because it poses risks to the patient.

- The standard of care for intensive care nurses and respiratory therapists requires that they suction the patient on a periodic basis, especially if peak inspiratory pressures are high.
- Physicians are typically looking for the peak inspiratory pressure number to be in the 30's to 40's.
- The ICU records reveal that Ms. Jones' airway pressures were elevated for a long time in the ICU, starting at 8:00 p.m., with the readings in the high 70's.
- The standard of care required that if interventions by ICU nurses and respiratory therapists were not effective, then notification of a physician was indicated.
- Between 12:30 a.m. and 1:30 a.m., the peak inspiratory pressure alarm was sounding, which indicated that something was blocking the air flow, yet instead of clearing the obstruction, the ICU nurse changed the high pressure setting on the alarm so it would not continue to signal the alarm.
- No doctor had been called during the interim.
- Shortly after 1:30 a.m. a code was called.
- Once the mucous blockage was removed, Ms. Jones' peak inspiratory pressures readings returned to the favorable range in the 30's.

Of further significance, Dr. Salzman testified that the brain damage to Ms. Jones occurred while she was in the ICU.

Dr. Kadakia provided pertinent testimony by deposition, from which we learn:

- The first time Dr. Kadakia saw Ms. Jones was when he examined her after the code was called, around 3:15 a.m.
- He was aware Ms. Jones had arrested prior to his arrival.
- When he first examined her he saw a significant amount of mucus plugging the endotracheal tube.
- He immediately performed a valage and suctioned most of the mucus to clear the obstruction to the endotracheal tube.
- He explained that increased resistance to flow of air into the endotracheal tube or into the tracheal bronchial system can cause a high-pressure alarm to sound.
- Increased resistance can be caused by a malposition of the tracheal tube, mucus plugging of trachea, fluid within the lungs, pneumonia, or anything that compresses the lungs, such as pneumothorax, or the lungs may get stiff due to infection or an inflammatory process.
- He was not notified when the high-pressure alarms started sounding, which commenced prior to 9:00 p.m.
- He explained that had he been informed of the increased pressure readings, with increases of more than 15, he would have been concerned, would have spoken with the respiratory therapist to see what was going on, and would have done more investigating to ascertain the cause.

Dr. Kadakia further testified that ICU records indicated that Ms. Jones was only receiving 30 to 40 percent of the air that was being pumped. He went on to explain that, based upon the ICU data, it was more likely than not that Ms. Jones had been having problems getting the right volume of air into her lungs since 8:10 p.m. In response to the question, "How long do you think that was happening to Ms. Jones?" Dr. Kadakia stated:

> A. It could have been happening, based on – I'd have to look at that table once again, the ventilator setting. Based on this timing here, at least about 10:00 p.m. I'm sorry. 2010. So that would be 8:10 p.m.
> Q. So more likely than not, she's been having the problem getting the right amount of volume into her lungs since 8:10 p.m.?
> A. Well, based on these numbers, that's what it appears.

Significantly, as it pertained to the issue of foreseeability, Dr. Kadakia testified that is was "very uncommon" for a patient to die in the ICU as a result of a mucous plug because it is something that can be corrected.

> Q. How often has someone's death been a result of a mucus plug, that you know about?
> A. It's very uncommon. It's pretty uncommon.
> Q. Why do you think it's uncommon?
> A. Well, because it's something you can deal with, something you can correct, something you can treat the patient for.
> Q. And how do you do that?
> A. Well, suction, bronchodilator treatments, bronchoscopy if you have to, or placement of an endotracheal tube.
> Q. So if you treat the patient quickly enough, then more likely than not, you can save the patient?
> A. Yes, you can.

Dr. Kadakia went on to conclude that the oxygen deprivation was caused by the mucous blockage of the endotracheal tube, which occurred as the blockage increased over a period of hours, all of which occurred after Dr. McLain's alleged negligence.

In addition to the testimony of the two physicians, we have the testimony of a licensed respiratory therapist, Laurie Beth Moore, who worked for Gateway Medical Center when Ms. Jones was transferred to the ICU. Ms. Moore testified that Dr. Kadakia should have been called by the ICU personnel, if the evidence showed that the "peak inspiratory pressures were high – above 75 at both 8:00 p.m. and 9:00 p.m." The evidence reveals the peak pressures were high for an extended period of time early in the evening; thus Dr. Kadakia should have been called at that time, but he was not.

Without weighing the evidence, as we are instructed by *Reynolds*, 887 S.W.2d at 823, we find there is material evidence upon which a jury could find the following: harmful effects resulted

from the care or lack of care Ms. Jones received in the ICU after the alleged negligence of Dr. McLain, the care or lack of care Ms. Jones received in the ICU actively worked to bring about a result which would not have followed from Dr. McLain's original negligence, and the alleged negligent care Ms. Jones received in the ICU could not have been reasonably foreseen by Dr. McLain. We therefore find there is material evidence concerning each element of the superseding cause contended by Defendants.

Based upon the foregoing, we therefore conclude the record contains material evidence sufficient to support a jury verdict for Defendants based upon the superseding cause defense at issue here. Accordingly, we find no error with the trial court instructing the jury as to the defense of superseding cause.

C.
DR. MCLAIN'S BOARD CERTIFICATION EFFORTS

Plaintiffs contend the trial court erred by granting Defendants' Motion in Limine prohibiting Plaintiffs from inquiring into previous failed efforts by Dr. McLain in the examination for board certification in his specialty, and in excluding evidence related to his alleged lack of truthfulness.

Although the trial court prohibited Plaintiffs from addressing the fact that Dr. McLain had taken but failed to pass the requisite certification tests, we find it more significant that Plaintiffs were not prevented from introducing the fact that he was not board certified. Indeed, it may be relevant whether a physician is or is not board certified in a specialty; however, we are unable to find any significance to the fact that a physician attempted to obtain board certification or for that matter never made the attempt. Moreover, the decision to admit or exclude the disputed evidence was a discretionary decision of the trial court. *See Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005). Such decisions are reviewed under the abuse of discretion standard. *Id.* For the reasons stated above, we find no error with the trial court's decision to exclude the disputed evidence.

As for the credibility component of this issue, and assuming arguendo the trial court erred by excluding the evidence for the limited purpose of attacking Dr. McLain's credibility, Plaintiffs must demonstrate the error involved a substantial right, which probably affected the judgment and would result in prejudice to the judicial process. Tenn. R. App. P. 36(b). The jury returned a verdict for Defendants based upon the superseding cause of what did or did not occur in the ICU. Once Dr. McLain transferred the patient to the ICU, he had no active involvement in the events that transpired in the ICU. Moreover, the material facts concerning what did or did not occur in the ICU are provided by witnesses other than Dr. McLain, and these facts are undisputed. Thus, the credibility of Dr. McLain is of no consequence as it pertains to what did or did not occur in the ICU. Accordingly, Plaintiffs cannot demonstrate that the exclusion of evidence concerning Dr. McLain's credibility involved a substantial right that probably affected the judgment and resulted in prejudice to the judicial process.

**IN CONCLUSION**

-10-

The judgment of the trial court is in all respects affirmed. Costs of the appeal are assessed to Appellants.

_____
FRANK G. CLEMENT, JUDGE